EL PUEBLO DE PUERTO RICO, demandante y peticionario, *v.* FÉLIX RAMOS SANTOS, MANUEL J. CRUZ AMORÓS y CARLOS E. APONTE VEGA, acusados y recurridos.

*Número:* CE-94-164          *Resuelto:* 30 de junio de 1995

812

*Pedro A. Delgado Hernández, Procurador General*, y *Grisel Hernández Esteves, Procuradora General Auxiliar*, abogados de El Pueblo, peticionario; *Luis A. Delgado Rodríguez, Glorimar Acevedo Acevedo* y *Neftalí Santiago Rodríguez*, abogados de los recurridos.

EL JUEZ ASOCIADO SEÑOR ALONSO ALONSO emitió la opinión del Tribunal.

Nos corresponde resolver si es válido un veredicto emitido por el Hon. Hiram Torres Rigual quien dirigió el juicio de los peticionarios después de haber cumplido setenta (70) años de edad, lo cual, alegadamente, viola la Sec. 10 del Art. V de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1. Resolvemos que el veredicto emitido resulta válido a la luz de la doctrina sobre el funcionario de

facto. Por las razones que expresamos más adelante no es necesario discutir el planteamiento constitucional.

## I

El 30 de marzo de 1993 se inició el juicio por asesinato en primer grado, Arts. 6 y 8 de la Ley de Armas de Puerto Rico, 25 L.P.R.A. secs. 416 y 418, contra los acusados recurridos, Félix Ramos Santos, Manuel J. Cruz Amorós y Carlos E. Aponte Vega, presidido por la Hon. Sylvia Ricard, Juez. Por incidentes suscitados durante el proceso, y a petición de la defensa, la juez decretó un *mistrial* y disolvió el Jurado.

El caso fue señalado nuevamente para juicio que sería celebrado el 21 de abril de 1993, siendo el caso asignado al Hon. Juez Especial Hiram Torres Rigual. Luego de varios incidentes procesales y de constituido el nuevo Jurado, el 1ro de mayo de 1993 comenzó el desfile de la prueba.

El 15 de mayo de 1993 el Jurado rindió veredicto de culpabilidad para todos los acusados y se señaló el acto de dictar sentencia para el 4 de agosto de 1993.

Antes de celebrarse el acto de dictar sentencia, los acusados advinieron en conocimiento de que a la fecha de inicio del juicio, el Honorable Torres Rigual tenía más de setenta (70) años de edad, por lo que el 3 de agosto de 1993 presentaron una Solicitud de Decreto de Anulación de Fallo para pedir que se detuviera el pronunciamiento de la sentencia al amparo de las Reglas 186 y 192.1 de Procedimiento Criminal, 34 L.P.R.A. Ap. II. Plantearon que la extensión del nombramiento del Honorable Torres Rigual —luego de éste haber cumplido setenta (70) años de edad— era inconstitucional, por lo que solicitaron la anulación del fallo.

El 14 de septiembre de 1993 se celebró una vista ante la Hon. Juez Velma I. González Rivera para escuchar los argumentos de las partes sobre dicho planteamiento. Ésta

solicitó, además, la presentación de memorandos de derecho.

El 2 de marzo de 1994 la Honorable González Rivera dictó una resolución para resolver que era nulo el veredicto emitido ante el Honorable Torres Rigual por éste haber presidido el juicio luego de haber cumplido setenta (70) años de edad.

Inconforme, el Estado Libre Asociado de Puerto Rico acudió ante nos solicitando la revocación de la resolución recurrida. Planteó como señalamientos de error que:

1. Erró el tribunal a quo al resolver que el Honorable Juez Torres Rigual dirigió el juicio después de cumplir setenta (70) años de edad en violación a la disposición del Artículo V, Sección 10 de la Constitución del Estado Libre Asociado de Puerto Rico.
2. Erró el tribunal a quo al resolver que los actos del Honorable Juez Torres Rigual[,] realizados después de cumplir setenta (70) años de edad, son nulos y al invalidar los veredictos condenatorios en este caso.

Mediante Resolución de 7 de marzo de 1994 ordenamos la paralización de los procedimientos en el tribunal de instancia hasta que otra cosa dispusiera este Tribunal. El 14 de marzo de 1994 concedimos a los acusados recurridos un término para que mostraran causa, si alguna, por la cual no debíamos revocar la resolución dictada en el caso de autos por la Honorable González Rivera.([1])

Al presente no se ha dictado sentencia en dicho caso.

Habiendo comparecido los acusados recurridos, estamos en posición de resolver.

## II

Mediante la Ley Núm. 19 de 30 de octubre de 1975 (4 L.P.R.A. secs. 62a–62g) se enmendó la Ley de la

---

([1]) El Juez Asociado Señor Negrón García disintió sin opinión escrita.

Judicatura(²) a los efectos de crear el cargo de Juez Especial y establecer sus funciones y poderes. En virtud de dicha ley se permitió designar a los jueces jubilados, que así lo solicitaran, como Jueces Especiales. El propósito de dicha ley fue permitir que el Pueblo de Puerto Rico se beneficiara de la capacidad y experiencia de los jueces retirados que estuvieran en disposición de ofrecer sus servicios, sin alterar su condición de pensionados que ganaron con sus años de servicio. La Sec. 10f de la Ley Núm. 19, *supra*, 4 L.P.R.A. ant. sec. 62f, disponía que "[n]inguna persona que hubiese *cumplido setenta años de edad* podrá ser *designada* o nombrada Juez Especial, y cualquier designación o nombramiento ya hecho *vencerá* cuando la persona cumpla los setenta años de edad". (Énfasis suplido.)

▮▮▮ Sin embargo, *el 12 de julio de 1986* se aprobó la Ley Núm. 125 (4 L.P.R.A. secs. 62f n. y 62g), la cual *derogó* la prohibición dispuesta en la Sec. 10f antes transcrita, que establecía el límite de setenta (70) años de edad para la designación o el nombramiento de una persona como Juez Especial y para el vencimiento de tal designación o nombramiento. La exposición de motivos de dicha ley hizo referencia a la Sec. 10, Art. V de nuestra Constitución, *supra*, la cual provee para el retiro obligatorio de los jueces cuando éstos hubiesen cumplido setenta (70) años de edad. Allí se indicó lo siguiente:

> Debemos entender que dicha edad se refiere al límite para poder ocupar el cargo *con carácter regular activo* y a los efectos del recibo de los *beneficios de retiro establecidos por la ley. No debe considerarse como un requisito para la prestación de servicios una vez se han acogido a dichos beneficios.*
>
> La Constitución y la Ley Orgánica de la Judicatura de los Estados Unidos, así como las constituciones y estatutos del poder judicial de varios estados de la Unión, establecen la edad de setenta (70) años como alternativa u opción para retiro a los jueces que hubieren completado los años de servicio que se le requieren. *No obstante, en la gran mayoría de estas jurisdiccio-*

---

(²) Ley Núm. 11 de 24 de julio de 1952 (4 L.P.R.A. sec. 1 *et seq.*).

*nes se autoriza al juez presidente del tribunal de última instancia tanto en el sistema federal como en el de los estados, a extender nombramientos con carácter especial u honorario a jueces retirados, sin imponer limitaciones de edad y sin que afecten los beneficios de retiro que reciben.* (Énfasis suplido.) Exposición de Motivos de la Ley Núm. 125, *supra*, 1986 Leyes de Puerto Rico 411–412.

La Sec. 10, Art. V de la Constitución del Estado Libre Asociado, *supra*, ed. 1982, pág. 361, dispone que:

La Asamblea Legislativa establecerá un sistema de retiro para los jueces, retiro que será obligatorio cuando hubieren cumplido setenta años de edad.

El Honorable Torres Rigual tomó posesión del cargo de Juez Especial a la edad de *sesenta y tres (63) años de edad.* En virtud de la derogación en el 1986 de la Sec. 10f de la Ley Núm. 19, *supra*, que proveía para el vencimiento de la designación o nombramiento del Juez Especial al cumplir los setenta (70) años de edad, el Honorable Torres Rigual, al cumplir los setenta (70) años *continuó realizando* sus funciones como Juez Especial. Así, el 21 de abril de 1993, le asignaron el caso de autos para presidir el juicio. A dicha fecha el Juez Torres Rigual contaba con setenta y un (71) años de edad.

## III

Independientemente de la constitucionalidad de la extensión del nombramiento o designación del Juez Especial Honorable Torres Rigual, luego de éste haber cumplido los setenta (70) años de edad, lo cierto es que *los actos llevados a cabo por éste resultan ser válidos en virtud de la doctrina sobre el funcionario de facto.* Nos explicamos.

En *Fernández v. Corte*, 71 D.P.R. 161 (1950), este Tribunal aplicó la doctrina sobre el funcionario de facto *a la figura de los jueces.* Allí se cuestionaba la designación de un juez para sustituir a otro que había solicitado una licen-

cia, alegándose que el Secretario del Tribunal no había certificado al Gobernador hecho alguno que exigiese a éste ordenar a otro juez que sustituyera al juez en propiedad, que el juez sustituto no había sido confirmado como tal por el Senado de Puerto Rico y que nunca prestó el juramento exigido por ley. A base de ello solicitaba que se declarase nula la sentencia emitida por este segundo juez. Al sostener la validez de dicha sentencia, aplicando para ello la doctrina sobre el funcionario de facto, en la pág. 181 señalamos que:

> ...La doctrina *de facto* es un principio de derecho que *imparte validez a los actos oficiales* de personas que, so color de autoridad, ejercen cargos que existen legalmente y en los cuales el público o terceras personas están interesados, cuando el cumplimiento de tales actos oficiales es para beneficio del público o de terceras personas, y no para su beneficio personal. La necesidad de esta doctrina es manifiesta: *sería irrazonable exigirle al público que investigue de antemano el título de los funcionarios con quienes se propone tratar, con el fin de averiguar si se puede confiar o no en la autoridad que asumen. Dalton* v. *Fabius River Drainage Dist.*, 184 S.W.2d 776, 782 (Mo., 1945); *Mansur* v. *Morris*, 196 S.W.2d 287, 295 (Mo., 1946); *State* v. *Levy*, 34 A.2d 370 (Vt., 1943); *Constantineau on the De Facto Doctrine, secs. 1–3, págs. 3–5; Jarrette, De Facto Public Officers: The Validity of their Acts and Their Rights to Compensation*, 9 So. Calif. L. Rev. 189, 217, et seq. (Énfasis suplido.) *Fernández v. Corte*, supra, pág. 181.

Con anterioridad al caso de *Fernández v. Corte*, supra, nos habíamos expresado en torno a la figura del funcionario de facto. En *Pueblo v. Rivera et al.*, 9 D.P.R. 403 (1905), aplicamos dicha doctrina a la figura de un fiscal especial, sosteniendo así la validez de una sentencia dictada en virtud de la acusación formulada y firmada por dicho fiscal. Asimismo, en *Ex Parte Dones*, 10 D.P.R. 179 (1906), aplicamos también la referida doctrina a la figura de *un juez*. Allí se alegaba que el tribunal que conoció de la causa y dictó sentencia estaba constituido por un solo juez, según lo autorizaba la Ley Judicial aprobada por la Legislatura de Puerto Rico el 10 de marzo de 1904, aun cuando

dicha ley estaba en contraposición a las disposiciones de la Ley Orgánica que disponían que dichos tribunales consistían de tres (3) jueces. Sostuvimos la validez de la sentencia conforme a la doctrina sobre el funcionario de facto. También, en *San Millán v. Asamblea Municipal de Arecibo*, 32 D.P.R. 279 (1923), aplicamos dicha doctrina a un miembro de una Asamblea Municipal.

Por su parte, en *Buckley v. Valeo*, 424 U.S. 1 (1976), se atacó la constitucionalidad de varias secciones de la *Federal Election Campaign Act of 1971* y secciones relacionadas del Código de Rentas Internas de 1954, según enmendado. Allí el Tribunal Supremo de Estados Unidos, a pesar de haber pasado juicio sobre la constitucionalidad de los nombramientos de los miembros de la *Federal Election Commission*, aplicó la doctrina sobre el funcionario "de facto" para dar validez a los actos llevados a cabo hasta ese momento por los miembros de la referida comisión. Se resolvió que la sección de la ley que proveía para el nombramiento de los miembros de la comisión violaba el Art. II, Sec. 2, Cl. 2 de la Constitución de Estados Unidos, L.P.R.A., Tomo 1, conocida como *Appointments Clause*. No obstante, también se resolvió que:

It is also our view that the Commission's inability to exercise certain powers because of the method by which its members have been selected should not affect the validity of the Commission's administrative actions and determinations to this date, including its administration of those provisions, upheld today, authorizing the public financing of federal elections. The past acts of the Commission are therefore accorded *de facto* validity, just as we have recognized should be the case with respect to legislative acts performed by legislators held to have been elected in accordance with an unconstitutional apportionment plan. *Connor* v. *Williams*, 404 U.S. 549, 550–551 (1972). See *Ryan* v. *Tinsley*, 316 F.2d 430, 431–432 (C.A.10 1963); *Schaefer* v. *Thomson*, 251 F.Supp. 450, 453 (Wyo 1965), aff'd. sub nom. *Harrison* v. *Schaefer*, 383 U.S. 269 (1966). Cf. *City of Richmond* v. *United States*, 422 U.S. 358, 379 (1975) (Brennan, J., dissenting). *Buckley v. Valeo*, supra, pág. 142.

De otra parte, la Revista Jurídica de la Escuela de De-

recho de la Universidad de Columbia realizó un detallado análisis de la doctrina de funcionario de facto. Las partes que a continuación citamos son de particular relevancia al caso ante nos.

An official must satisfy detailed statutory and constitutional requirements before he can claim lawful authority to exercise governmental functions. These requirements may include specific appointment and election procedures, and oath of office, and the posting of a bond. *If every exercise of official authority required perfect title to office, government would be substantially impeded in its efforts to take final and effective actions. Uncertainty* would permeate every official action—from the finding of a tax deficiency to the conviction of a criminal.... *The de facto officer doctrine prevents such uncertainty* by precluding challenges to official actions on the ground of defective title in the acting official. ...

The de facto officer doctrine limits an individual's "ability to challenge governmental action on the ground that the officers taking that action are improperly in office". The doctrine assumes that an individual suffers no judicially cognizable injury when he is the subject of adverse governmental action that is legitimate in all respects save that the official taking the action lacks lawful title to office.

... The "touchstone of de facto status" is that the official must have acted *under color of authority*, "surrounded with the insignia of office". The focus is on the appearance to the public of legitimate title in the official performing governmental duties.... Where an official meets these requirements, his past actions merit de facto validity and bind the individuals subject to his authority. ...

The de facto doctrine is one of a number of rules ensuring the *stability* of governmental processes. ... The Supreme Court has noted that in the absence of the doctrine, "endless confusion would result" because the past actions of de facto officials would be subject to wholesale invalidation....

In addition to safeguarding stability, the de facto officer doctrine promotes *administrative efficiency*.... In the absence of the de facto doctrine, *collateral challenges* could be used as a device for harassing public officials and obstructing their performance of governmental duties. The doctrine also guards against the possibility that an individual, aware of a title defect, would await the outcome of an official action and challenge it on the

basis of defective title if it were adverse to his interests....

> The de facto officer doctrine developed as a necessary tool to enhance *finality and certainty* in governmental actions. These goals are even more important in today's administrative state, where the actions of officials extensively affect the lives of all individuals. While recent decisions involving collateral title challenges sometimes have been critical of the rule, the de facto officer doctrine correctly recognizes that, in most cases, private parties should not be allowed to enforce prerequisites to lawful official titles in an effort to avoid the consequences of an official's actions. (Énfasis suplido y escolios omitidos.) K.A. Clokey, en *The De Facto Officer Doctrine: The case for Continued Application*, 85 Colum. L. Rev. 1121, 1121–1139 (1985).

En síntesis, la doctrina sobre funcionarios "de facto" se fundamenta en las necesidades siguientes: (1) evitar incertidumbre y confusión en los procesos decisionales públicos; (2) dar estabilidad y certeza a dichos procesos, al gobierno y a la sociedad organizada como tal; (3) evitar litigación, duplicación de esfuerzos y costos innecesarios; (4) lograr una administración y adjudicación continuada, eficiente, que permita tomar acciones finales; (5) evitar la obstrucción mediante ataques colaterales de las acciones de funcionarios públicos, impidiendo así el mejor descargo de sus funciones y deberes, teniendo al efecto de socavar las instituciones del funcionario.

Por último, pero no menos importante, sería irrazonable exigir a los ciudadanos que investiguen de antemano todos los detalles sobre el título y la fuente de autoridad del funcionario con el cual éste se propone tratar, con el fin de determinar si puede confiar o no en su autoridad aparente.

## IV

Claro está, para que se aplique la doctrina del funcionario de facto es necesario que se den determinadas circunstancias, a saber: (1) el cargo de jure tiene que exis-

tir para que pueda haber un funcionario de facto; (2) la persona que ocupa el cargo de facto debe estar en posición efectiva y en control del cargo sin intervención del funcionario de jure para evitar la proyección de una imagen de un intruso o usurpador; (3) la persona debe desempeñar las funciones so color de autoridad; (4) la persona debe desempeñar las funciones en las circunstancias que normal y razonablemente rodean el ejercicio del cargo de jure; (5) la apariencia y la percepción pública debe ser la de que se está ejerciendo el cargo legítimamente, o sea, que el público presume y es inducido a creer que está ocupando el cargo legítimamente. Véanse: *Fernández v. Corte*, supra; *In re Wingler*, 58 S.E.2d 372, 374–375 (1950), y *Butler v. Phillips*, 88 P. 480 (1906).

■ Algunas circunstancias que pueden causar que el funcionario sea uno de facto son: (1) que la persona no se haya ajustado a un precedente, requisito o condición como, por ejemplo, tomar un juramento, prestar una fianza o algo similar; (2) que el nombramiento es nulo por insuficiencia de poder en el cuerpo o autoridad nominadora que lo elige o nombra; (3) debido a algún defecto o irregularidad desconocida por el público; (4) que el nombramiento o elección haya sido hecho de conformidad con una ley inconstitucional antes de que ésta fuera declarada como tal. Véase *San Millán v. Asamblea Municipal de Arecibo*, supra, págs. 282–283.(³)

En el caso que nos ocupa, la ley vigente —al momento en que el Honorable Torres Rigual cumplió *los setenta (70) años*— *no tiene ninguna prohibición* expresa sobre el *límite de edad de setenta (70) años como lo tenía antes de ser enmendada.* Por ello, lo que se está cuestionando no es la inconstitucionalidad de dicha ley, pues ésta, de su faz, no

---

(³) A los fines de resolver este caso no es necesario que discutamos las doctrinas que se han elaborado sobre ataques colaterales a la decisión sobre quién tiene legitimación activa para cuestionarlo o sobre cuándo se trata de una controversia sustancial meritoria.

contraviene la Constitución, sino el que el Honorable Torres Rigual haya actuado como Juez Especial luego de los setenta (70) años. Por ende, no hay que entrar a considerar si la ley es constitucional o no. Lo que se cuestiona *realmente* es *el acto* de presidir el juicio, llevado a cabo por el Honorable Torres Rigual. Nótese, además, que en *San Millán v. Asamblea Municipal de Arecibo*, supra, en los méritos no se planteó ni se discutió problema constitucional alguno. Lo allí expresado se refiere exclusivamente a los casos en que se ha atacado la *ley propiamente* y un tribunal la ha declarado inconstitucional, lo cual está sostenido por los casos allí citados de *Wendt v. Berry*, Ann. Cas. 1915C, 493; *Howard v. Burke*, 140 A.S.R. 159; *Hussey v. Smith*, 99 U.S. 20 (1879); *Ball v. United States*, 140 U.S. 118 (1891). Éste no es el caso ante nos. La ley en controversia de su faz no contraviene la Constitución.

## V

Aplicando la doctrina sobre funcionario de facto al caso de autos, concluimos que el veredicto emitido en el juicio presidido por el Honorable Torres Rigual es válido.

Éste ejercía un cargo de juez especial creado por ley y estaba en posesión efectiva del cargo, sin haberlo usurpado. Desempeñaba sus funciones so color de autoridad y derivaba su autoridad de un nombramiento hecho de conformidad con la ley desde 1985, cuando tenía sesenta y tres (63) años hasta el 3 de agosto de 1993, es decir, por ocho (8) años. Siempre desempeñó dicho cargo rodeado de todas las circunstancias que normal y razonablemente rodean su ejercicio y la percepción del público y la apariencia era de que lo ejercía legítimamente. No había ningún indicio de ilegalidad notoria. Como *cuestión de hecho*, sólo *ejerció dicho cargo* de *facto* en el *caso de autos desde* el 21 de abril de 1993, cuando fue asignado, al 15 de mayo de 1993,

cuando el Jurado rindió veredicto (esto es, por veinticinco (25) días).

## VI

Ha sido doctrina reiterada de este Foro que no entraremos a considerar la constitucionalidad o inconstitucionalidad de una ley o de una actuación a menos que ello sea imprescindible y no podamos resolver la controversia ante nos por otras razones. Véanse: *Caquías v. Asoc. Res. Mansiones Río Piedras*, 134 D.P.R. 181 (1993); *Fac. C. Soc. Aplicadas, Inc. v. C.E.S.*, 133 D.P.R. 521 (1993).

Ésa es la situación del presente caso. Siendo las actuaciones del Honorable Torres Rigual válidas por haberse desempeñado como un *funcionario de facto*, no es necesario entrar en el planteamiento constitucional.

Por otra parte, el planteamiento constitucional es académico. Veamos.

La doctrina de academicidad constituye una de las manifestaciones concretas del concepto de justiciabilidad, que a su vez acota los límites de la función judicial. *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993). En *E.L.A. v. Aguayo*, 80 D.P.R. 552, 584 (1958), conceptualizamos lo que constituye un caso académico al señalar que este

> ...es "uno en que se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes que éste haya sido reclamado, o una sentencia sobre un asunto, que al dictarse, por alguna razón no podrá tener efectos prácticos sobre una controversia existente ...

Esta doctrina requiere que durante todas las etapas de un procedimiento adversativo, incluso la etapa de apelación o revisión, exista una controversia genuina entre las partes. *DeFunis v. Odegaard*, 416 U.S. 312 (1974); *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994).

Se trata de evitar opiniones consultivas en asuntos abstractos de derecho. Según señaláramos en *C.E.E. v. Depto. de Estado*, supra, págs. 935–936:

> Los tribunales pierden su jurisdicción sobre un caso por academicidad cuando ocurren cambios durante el trámite judicial de una controversia particular que hacen que ésta pierda su actualidad, de modo que el remedio que pueda dictar el tribunal no ha de llegar a tener efecto real alguno en cuanto a esa controversia. Con esta limitación sobre el poder de los tribunales, se persigue evitar el uso innecesario de los recursos judiciales y obviar pronunciamientos autoritativos de los tribunales que resulten superfluos. *Com. de la Mujer v. Srio. de Justicia*, supra,[4] págs. 724–725. (Escolio omitido.) Véase, además, *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988).

Existen varias excepciones a la doctrina de academicidad, a saber: (a) aquéllas en que se plantea una cuestión recurrente que por su naturaleza hace muy difícil dilucidarla nuevamente en los tribunales, (b) aquéllas en las que la situación de hechos ha sido cambiada por el demandado pero no tiene vicios de permanencia, (c) aquellas que aparentemente son académicas pero en realidad no lo son por sus consecuencias colaterales, y (d) aquellas en las que el tribunal ha certificado un pleito de clase y la controversia se tornó académica para un miembro de la clase mas no para el representante de ésta. *El Vocero v. Junta de Planificación*, supra; *Noriega v. Hernández Colón*, supra.

En el caso de autos, no estamos ante ninguna de las excepciones consideradas en la jurisprudencia. Tomamos conocimiento judicial de que el Hon. Hiram Torres Rigual no está ocupando plaza alguna como juez especial y de que no existe ningún otro juez nombrado en tal capacidad que haya cumplido los setenta (70) años de edad.[5]

---

[4] 109 D.P.R. 715 (1980).

[5] Al presente sólo existen dos (2) nombramientos de Jueces Especiales, a saber: la Hon. Blanca Iris Bonilla y la Hon. Aida Molinari. Ninguna de ellas tiene setenta (70) años de edad.

Habiendo concluido que el Honorable Juez Torres Rigual es un juez de facto y sin existir ningún caso o controversia específica que requiera que nos expresemos sobre la constitucionalidad de su nombramiento hecho en virtud de la Ley Núm. 19, según enmendada, *supra*, sería académico el que así lo hiciéramos."

■ Por otra parte, en virtud de la aprobación de la nueva Ley de la Judicatura de Puerto Rico de 1994, Ley Núm. 1 de 28 de julio de 1994 (4 L.P.R.A. sec. 22 *et seq.*), en cuyo Art. 5.105 (4 L.P.R.A. sec. 224)[6] se provee para el retiro obligatorio de los jueces especiales, resulta imposible que un juez especial permanezca en su puesto luego de cumplir setenta (70) años de edad, puesto que el referido artículo provee para el vencimiento de la designación una vez cumplida dicha edad.

## VI

En conclusión, aplicando al caso de autos la doctrina sobre funcionario de facto, resolvemos que el veredicto emitido en el juicio presidido por el Hon. Torres Rigual es válido. *Por lo tanto, se expide el auto, se revoca la resolución recurrida y se devuelve el caso al tribunal de instancia para que se dicte la sentencia correspondiente conforme al veredicto emitido por el Jurado.*

*Se dictará sentencia de conformidad.*

El Juez Asociado Señor Fuster Berlingeri emitió una opinión de conformidad. El Juez Asociado Señor Negrón García disintió con opinión escrita y el Juez Asociado Señor Rebollo López disintió sin opinión escrita.

---

(6) Dispone el Art. 5.105 de la nueva Ley de la Judicatura de Puerto Rico de 1994 (4 L.P.R.A. sec. 224), que:

"Ninguna persona que hubiese cumplido setenta (70) años podrá ser designada Juez Especial Superior, y cualquier designación ya hecha vencerá cuando la persona cumpla los setenta (70) años de edad."

— o —

Opinión de conformidad emitida por el Juez Asociado Señor Fuster Berlingeri.

Estoy conforme con el resultado que se anuncia en la opinión de la mayoría en este caso, de la cual formo parte. Comparto plenamente también los pronunciamientos normativos que se formulan en dicha opinión. En particular, estoy conteste en que procede aplicarse aquí nuestra reiterada norma de no decidir los casos ante nos sobre bases constitucionales, si existen fundamentos de otra índole que permitan disponer de ellos. *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).

Lo anterior, no obstante, me parece menester formular esta breve opinión de conformidad para hacer hincapié en que la mayoría de este Tribunal no sólo no ha declarado inconstitucional la designación del juez especial en el caso ante nos, sino que, *de ninguna manera, intimamos tal inconstitucionalidad.* Es decir, cuando no pasamos juicio sobre la cuestión de si era constitucional o no que el juez aludido continuara ejerciendo sus funciones particulares luego de cumplir 70 años de edad, no estamos intimando, de modo alguno, que el ejercicio del cargo de juez especial por una persona que haya cumplido ya los 70 años de edad es inconstitucional. Tampoco estamos evadiendo indirectamente hacer tal declaración de inconstitucionalidad, como se sugiere en la opinión disidente. Lo único que significa nuestro dictamen es que la mayoría que lo suscribe decidió *no resolver* la aludida cuestión constitucional, por estimarlo innecesario; no significa nada más ni nada menos.

Debe reiterarse que frente a la tesis formulada en la opinión disidente de que nuestra Constitución no permite ningún tipo de desempeño judicial por personas mayores de 70 años, existe otra tesis, a mi juicio, al menos tan respetable como la del compañero disidente, que sostiene el criterio opuesto. Conforme esta otra tesis, el claro mandato

de la Sec. 10, Art. V de nuestra Constitución, L.P.R.A., Tomo 1, de que los jueces deben retirarse al cumplir 70 años de edad, se refiere únicamente a aquellos que ocupan cargos regulares en la Judicatura; es decir, que dicha disposición sólo aplica a las personas que se desempeñan a tiempo completo como jueces, que reciben un salario como tales y que ocupan la generalidad de los cargos típicos y corrientes del Sistema Judicial. Según esta otra tesis, el mandato constitucional de retiro obligatorio a los 70 años de edad no impide que una vez se hayan jubilado algunas de estas personas, aptas para ello, puedan prestar un servicio judicial ocasional, de modo excepcional y a título honorario; sin sueldo, y sin ocupar un cargo judicial activo o regular. Esta otra tesis fue adoptada oficialmente por la Asamblea Legislativa y el Gobernador de Puerto Rico en 1986 y vertida en la Ley Núm. 125 de 12 de julio de ese año, Leyes de Puerto Rico, pág. 410, que contempló para la designación como jueces especiales, aun a personas que hubiesen cumplido los 70 años de edad.

¿Cuál de estas dos interpretaciones del alcance de la referida Sec. 10, Art. V de nuestra Constitución es la correcta? Eso es precisamente lo que la mayoría de este Tribunal decide *no resolver* en este caso. La mayoría opta por no decir cuál de las dos tesis aludidas debe prevalecer.

Debe quedar claro que la razón por la cual la mayoría no adoptamos la segunda de las tesis antes mencionada, nada tiene que ver con sus méritos. No es porque dicha tesis carezca de fundamentos que no la incorporamos a la opinión del Tribunal. Por el contrario, la interpretación del alcance de la Sec. 10, Art. V de nuestra Constitución, *supra*, consagrada en la aludida Ley Núm. 125, tiene bases meritorias. Un examen cuidadoso del *historial* de la disposición constitucional sobre el retiro obligatorio de los jueces al cumplir los 70 años de edad demuestra que ésta sólo perseguía que, a partir de la adopción de nuestra Constitución, los nuevos jueces a nombrarse a los cargos judicia-

les *comunes*, contemplados por los que la redactaron, tendrían que jubilarse al cumplir 70 años de edad. La discusión de esta disposición durante la Asamblea Constituyente sólo gira en torno a las nuevas personas que ocuparían los cargos de jueces del Tribunal Supremo, jueces de distrito y jueces municipales, que eran los que existían entonces como cargos judiciales regulares.(¹) *En ningún momento durante el debate en la Asamblea Constituyente se planteó o siquiera se mencionó el asunto del servicio especial y honorífico que excepcionalmente podrían prestar los jueces ya retirados.*

En el historial de nuestra Constitución, la única discusión que se conoce sobre si el retiro de los jueces implica la separación completa del servicio judicial aparece en el informe medular a la Constituyente sobre la Rama Judicial, preparado por la Escuela de Administración Pública de la Universidad de Puerto Rico. *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, Parte IV. Allí se reconoció que permitir que algunos jueces retirados, de particular capacidad, pudiesen aceptar invitaciones para regresar a un puesto judicial especial, por períodos limitados de tiempo, ayudaría a crear "un fondo de reserva de talento judicial" integrado por personas "que conservan su eficiencia después de la edad de retiro", como se había hecho en la nueva Constitución de la India.(²)

A la luz del historial aludido, pues, podría afirmarse que los que redactaron nuestra Constitución no quisieron prohibir el valioso servicio ocasional y honorífico de jueces retirados de gran capacidad y experiencia, aunque tuviesen más de 70 años de edad. Ciertamente, no hay nada en dicho historial que permita concluir que la mayoría de los miembros de la Asamblea Constituyente tuvieron la inten-

---

(¹) Véanse, por ejemplo: las expresiones sobre el particular durante el debate en la Asamblea Constituyente el 30 de enero de 1952 (3 Diario de Sesiones de la Convención Constituyente 2297 (1952)).

(²) *La Nueva Constitución de Puerto Rico*, Río Piedras, Ed. U.P.R., 1954, Parte IV, págs. 492–495.

ción de prohibir ese servicio especial. Si algo puede afirmarse es exactamente lo contrario. La tesis opuesta a la que sostiene el compañero disidente, pues, tiene fundamentos respetables.[3] No es por falta de méritos que no la adoptamos.

En resumen, no empece existir dos interpretaciones *diversas* sobre el alcance de la disposición constitucional en cuestión, la mayoría ha optado por no resolver a base de ellas, por no ser necesario. Ninguna de las dos interpretaciones se acepta o se rechaza, independientemente de los méritos que cada una pueda tener. No resolvemos sobre bases constitucionales porque este es el tipo de caso que claramente ilustra la sabiduría de nuestra política judicial de adjudicar cuestiones constitucionales, sólo cuando es indispensable hacerlo.

---

[3] Ausente una expresión clara y definitiva sobre la intención de los redactores de nuestra Constitución en cuanto al servicio judicial ocasional y honorífico para jueces retirados mayores de 70 años que poseen gran capacidad y experiencia, sería de aplicación aquí el principio sobre interpretación de la Constitución que reiteradamente ha reconocido este Tribunal. Hemos afirmado antes que la Constitución no es una pieza de museo; que su vitalidad descansa en su dinamismo; que su permanencia y estabilidad depende de su capacidad para responder a los distintos problemas sociales y económicos que encara el país; que este Tribunal tiene el deber de interpretarla en sintonía con las realidades de Puerto Rico para plasmar las esperanzas de futuras generaciones. *P.I.P. v. C.E.E.*, 120 D.P.R. 580 (1988); *P.R. Tel. Co. v. Martínez*, 114 D.P.R. 328 (1983); *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250 (1978).

En un país como Puerto Rico, donde el talento de las personas es nuestra mayor riqueza, es anacrónico y dispendioso no hacer uso ocasional de la gran capacidad y experiencia que algunos jueces retirados indudablemente tienen, aun cuando puedan haber cumplido los 70 años de edad. Cuando no hay un claro mandato que lo prohíba, insistir en ello mediante una interpretación rígida y literal de la Sec. 10, Art. V de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1, ciertamente puede considerarse como inconsistente con la reiterada noción de que "[i]nterpretamos una Constitución, no los Rollos del Mar Muerto". *P.R. Tel. Co. v. Martínez*, supra, pág. 350.

— O —

Opinión disidente del Juez Asociado Señor Negrón García.

I

De entrada, en recta lógica, si se acepta que la Constitución obliga a los jueces al retiro forzoso (jubilación) a los setenta (70) años de edad, ¿bajo qué argumento misterioso puede al otro día esa *misma persona* ponerse la *misma toga*, sentarse en el *mismo estrado* y seguir administrando la *misma justicia?* ¿Sólo porque ahora su nombramiento es como juez "especial" en función a su horario limitado y dieta diaria?

Con todo respeto, la opinión mayoritaria está revestida de un eufemismo impermisible. "[A]l partir de conceptos y no de la realidad para razonar jurídicamente, olvidamos algo que con mucha certeza ha observado el filósofo neotomista Noel: *De un gancho pintado en una pared no se puede colgar más que una cadena igualmente pintada en la pared.*" (Énfasis en el original.) J. Vallet de Goytisolo, *Panorama del Derecho Civil*, 2da ed., Barcelona, Ed. Bosch, 1973, pág. 67.

Nada en la Constitución ni en su historial valida la tesis legislativa de que los jueces que alcancen la edad máxima de *retiro obligatorio* (jubilación) puedan *después* continuar como "jueces especiales" o ser nombrados como tal. Todo lo contrario, *sin excepciones* y con referencia a cualquier juez —por interacción recíproca de la Sec. 10, Art. V y la Sec. 3, Art. IX de la Constitución del Estado Libre Asociado, L.P.R.A., Tomo 1— se *proscribieron* los servicios judiciales más allá de la edad de jubilación.

De dudosa juridicidad, por no decir ilógico, es el curso y razonamiento mayoritario que consiste en entrar a perfilar y aplicar la doctrina de *funcionario de facto* sin declarar inconstitucional previamente la Ley Núm. 125 de 12 de

julio de 1986, Leyes de Puerto Rico 410, que eliminó ese límite de edad del cargo de jure de Juez Especial. 4 L.P.R.A. sec. 62(f). *Semejante salto conceptual es al vacío y jurídicamente mortal.*

Debemos recordar que la *fuente de autoridad de este Tribunal no es celestial.* En virtud de ello, es la fuerza persuasiva intrínseca de nuestros fundamentos lo que genera respeto, autoridad y acatamiento de las decisiones de este Foro. Rechazamos el dogma que da a las mayorías, *simplemente por la superioridad numérica,* razón del derecho divino. *Elaboremos.*

## II

En su sustrato, la opinión mayoritaria correctamente sostiene que la doctrina de funcionario de facto presupone la existencia de un cargo de jure y, además, que su nombramiento "haya sido hecho de conformidad con una ley inconstitucional antes de que ésta fuera declarada como tal". Véase Opinión mayoritaria, pág. 822. Bajo esos predicados resulta obvio que si la ley es válida, el nombramiento es de jure. En ese supuesto, ¿no es acaso innecesario, por no decir imposible, activar la figura del funcionario de facto? Ciertamente no puede decidirse este caso aplicando la doctrina de *funcionario de facto* a *menos que haya precedido un decreto de inconstitucionalidad de la Ley Núm. 125, supra.*

Ante esta realidad, ¿cómo pueden "hacer académica" la cuestión? Opinión mayoritaria, págs. 824–826. ¿Cómo evadir el decreto de inconstitucionalidad de la susodicha Ley Núm. 125 que excluyó a los jueces "especiales" del mandato de retiro obligatorio (jubilación) al arribar a los setenta (70) años?

El mandamiento constitucional dispone:

La Asamblea Legislativa *establecerá* un sistema de retiro para los jueces, *retiro que será obligatorio cuando hubieren*

*cumplido setenta años de edad.* (Énfasis suplido.) Art. V, Sec. 10, Const. E.L.A., L.P.R.A., Tomo 1, ed. 1982, pág. 361.

Advertimos un texto *imperativo*, libre de ambigüedades, producto del debate en la Asamblea Constituyente. *Ordena* establecer un "Sistema de Retiro de la Judicatura [para que] los jueces puedan acumular reservas para su vejez, incapacidad, separación del servicio o muerte, garantizando su independencia". *García Martínez v. Gobernador,* 109 D.P.R. 294, 301 (1979). Impone a todos una "jubilación compulsoria" a los setenta (70) años. Ese retiro también permite una constante renovación y designación de nuevos jueces.

La Sec. 3 del Art. IX de nuestra Constitución, *supra,* ayuda a descubrir èl verdadero significado de este precepto. Con vigencia *transitoria* excluyó "del límite de edad fijado por esta Constitución para el retiro obligatorio [a] todos los jueces de los tribunales de Puerto Rico *que estén desempeñando sus cargos a la fecha en que comience a regir esta Constitución* ...". (Énfasis suplido.) 1 Diario de Sesiones de la Convención Constituyente 512–513 (1952). Véanse: Diario de Sesiones, *supra,* Vol. 3, págs. 1678, 2148, 2165–2166, 2297 y 2307–2310.

El siguiente diálogo, cuyos protagonistas fueron los delegados Gutiérrez Franqui y Reyes Delgado, revela su propósito:

> Sr. Gutiérrez Franqui: ... Al examinar esta disposición en la Comisión de Redacción y Estilo, y tratando de aclarar un poco el concepto, en relación con la frase "independientemente del límite de edad fijado por esta constitución", encontramos en el Diario de Sesiones correspondiente al día 54 de sesión, de la Convención, que en torno a esta disposición se expresó que la salvedad únicamente se refería a los jueces del Tribunal Supremo. Y que además, se dio como fundamento de que eso era así, que solamente se refería a los jueces del Tribunal Supremo, porque la disposición sobre retiro compulsorio solamente alcanzaba a los jueces del Tribunal Supremo.
> Examinando, sin embargo, *la disposición sobre el artículo judicial, según quedó aprobado, encontramos que la disposición*

> *sobre retiro compulsorio a los 70 años se refiere a todos los jueces, y no únicamente a los jueces del Tribunal Supremo.* Siendo eso así, estimamos que hay una *inconsistencia* entre dos disposiciones de la constitución que debe *aclarar* esta Convención, adoptar el criterio que crea adecuado; y entonces la Comisión de Estilo lo pondrá en la forma que corresponda. (Énfasis suplido.) 3 Diario de Sesiones, *supra*, Vol. 3, pág. 2297.

La inconsistencia aludida generó una propuesta aclaratoria del señor Reyes Delgado para que se excluyeran *todos* los jueces que *ocupaban* en *aquel momento* sus cargos. Se refería a los incumbentes magistrados de este Tribunal Supremo —cuyos nombramientos entonces eran vitalicios de origen presidencial federal— los de Distrito (después Superior) y Municipal (después Distrito). O sea, dicho delegado planteó que era justo que "la excepción se extendiese *también* a aquellos jueces que estén por cumplir el término para que fueron electos, por si acaso éstos cayeran dentro del límite de 70 años". (Énfasis suplido.) Diario de Sesiones, *supra*, Vol. 3, pág. 2308.

Ante dicho planteamiento, el Delegado señor Gutiérrez Franqui inquirió:

> ¿Entonces, si he entendido bien al compañero, la proposición que hace a la Convención, *es que se adopte la decisión de que queden excluidos de las disposiciones obligatorias de retiro*, los *actuales* jueces del Tribunal Supremo; y, en cuanto a los *demás jueces*: que quedan excluidos en lo que se refiere al cumplimiento de sus *actuales* términos?
>
> SR. REYES DELGADO: *Exacto.* Diario de Sesiones, *supra*, Vol. 3, pág. 2308.

Así aclarado, la proposición fue secundada y, luego de otra lectura, aprobada por la Asamblea. En su obra *Sistema Judicial de Puerto Rico*, Río Piedras, Ed. U.P.R., 1978, pág. 128, el Lcdo. José Trías Monge, con absoluta fidelidad a ese legajo, señala que "[l]as recomendaciones de la Comisión se *enmendaron* en segunda lectura *para requerir que el retiro de todos los jueces fuese obligatorio cuando cumpliesen setenta años de edad*". (Énfasis suplido.)

## III

Se ha intentado justificar la Ley Núm. 125, *supra*, a base de que el límite de los setenta (70) años es contrario a las tendencias modernas sobre la mejor utilización de los servicios de jubilados. Incluso se ha dicho que son jueces *distintos*, ahora "especiales", ya que no están sujetos al horario y a la jornada de los "regulares-activos".

La dificultad de ambos argumentos es que estamos ante un mandato y una obligación, sin excepciones, de rango constitucional, que goza de supremacía sobre la voluntad y el buen deseo de la Legislatura de aumentar los recursos de personal en la Rama Judicial.

Bajo el diseño constitucional vigente es impermisible que coexistan dos (2) tipos de jueces: (1) unos "regulares-activos" a quienes la Constitución les impone un método para sus nombramientos (Primer Ejecutivo y Consejo y Consentimiento del Senado), mecanismo y razones para destitución, prohibición de intervenir directa o indirectamente en actividades políticas de cualquier tipo, unas garantías en cuanto a sus términos y sueldos, y el *retiro obligatorio a los setenta (70) años de edad*, y (2) *simultáneamente* otros jueces denominados "especiales", sujetos también a las *mismas protecciones, prerrogativas y limitaciones constitucionales, excepto el límite de edad.*

## IV

El *nombre o la etiqueta no hace la cosa; lo crucial es su contenido y sustancia.* El apellido "especial" es una forma sutil de tratar de evadir *indirectamente* lo que la Constitución *directamente* manda, esto es, que todo juez está "obligado" a jubilarse al cumplir setenta (70) años.

Lo absurdo de la situación queda ilustrado gráficamente en el cuadro comparativo de características comunes siguiente:

| CUADRO COMPARATIVO | |
|---|---|
| Características | |
| Juez Regular | Juez Especial |
| *Título*: Juez | Juez *Especial* |
| *Cualificaciones*: Abogado, con experiencia de varios años; buena reputación; menor de setenta (70) años. | *Cualificaciones*: (Ex Juez) abogado, con experiencia de varios años; buena reputación; *menor* o *mayor* de setenta (70) años. |
| *Nombramiento*: *Primer Ejecutivo* y Consejo y Consentimiento del *Senado*. | *Nombramiento*: *Primer Ejecutivo* y Consejo y Consentimiento del *Senado*.<br><br>o<br><br>Tribunal Supremo si fueron nombrados después de la ley.([1]) |
| Funciona como Juez Superior o Juez de Distrito. | Funciona como Juez *Especial* Superior o Juez *Especial* de Distrito. |
| Realiza funciones judiciales por designación de ley y del Juez Presidente. | Realiza funciones judiciales por designación de ley y del Juez Presidente. |
| Asignación con o sin término fijo. | Asignación con término fijo. |
| Posee *todos* los poderes y prerrogativas judiciales | Posee *todos* los poderes y prerrogativas judiciales |
| Celebra matrimonios y puede tener y portar arma de fuego. | Celebra matrimonios y puede tener y portar arma de fuego. |
| Prohibido ejercer abogacía. | Prohibido ejercer abogacía. |
| No puede practicar notariado. | No puede practicar notariado. |
| Sujeto a Cánones de Ética Judicial. | Sujeto a Cánones de Ética Judicial. |
| Cumple Reglas para la Administración del Tribunal de Primera Instancia. | Cumple Reglas para la Administración del Tribunal de Primera Instancia. |
| Le aplican normas administrativas de la Oficina de Administración de los Tribunales. | Le aplican normas administrativas de la Oficina de Administración de los Tribunales, si no son incompatibles con su jornada especial. |

---

([1]) *Quaere*, su constitucionalidad.

| Le cubren prohibiciones sobre actividades políticas. Art. V, Sec. 12, Const. E.L.A., L.P.R.A., Tomo 1. | Le cubren prohibiciones sobre actividades políticas. Art. V, Sec. 12, Const. E.L.A., L.P.R.A., Tomo 1. |
|---|---|
| "Sueldo" fijado por ley. | "Pensión" fijada por ley más dietas. |

Notamos, pues, que una vez "jubilado constitucionalmente" por edad, la única diferencia esencial a la condición anterior de juez es la "jornada especial y dietas". Ante esta realidad no contradicha, otra vez preguntamos: "Una vez alcanzada la edad de 70 años de retiro constitucional obligatorio, ¿puede un juez jubilado ser nombrado por el Tribunal Supremo y *retornar* a la judicatura a ejercer las *mismas prerrogativas del cargo que poco antes tuvo que abandonar?* ¿Son lo determinante y esencial las funciones y deberes del cargo y no el título de 'Juez Especial'? ¿Tiene algún sentido jurídico esta determinación? ¿Existe realmente alguna diferencia, o por el contrario es *ficticia?* Y finalmente, ¿no estamos indirectamente incumpliendo un mandato constitucional que goza de supremacía sobre uno legislativo? Las contestaciones que brindemos son vitales para el país y futuro del Poder Judicial." (Énfasis suplido.) *Designación Juez Especial*, 119 D.P.R. 411, 415–416 (1987), *voto disidente*, al cual se unió el Juez Asociado Señor Rebollo López.

La mayoría, al resolver hoy el caso bajo la doctrina de *funcionario de facto*, implícitamente reconoce que la Ley Núm. 125, *supra*, es inconstitucional. *Ex profeso*, contra toda lógica adjudicativa, han elaborado la proposición excusatoria de que el planteamiento es académico. La contradicción conceptual y metodológica es insalvable.

Para "academizar" el planteamiento de inconstitucionalidad, nos dicen que lo realmente cuestionado es el "acto de

presidir el juicio, llevado a cabo por el Honorable Torres Rigual". (Énfasis suprimido.) Opinión mayoritaria, pág. 823. *Olvidan* que la ilustrada sala de instancia precisamente dictaminó *inconstitucional* todo el proceso y veredicto condenatorio presidido por el Honorable Torres Rigual. Pasan por alto que en la petición de *certiorari* ante nos, el Procurador General señala y discute como error, in extenso, *ese decreto de inconstitucionalidad* y, finalmente, ignoran que "el acto de presidir [u]n juicio" entraña necesariamente el ejercicio de una prerrogativa judicial que corresponde sólo a jueces; función que precisa de una investidura legal y de un nombramiento de jure. Sólo ausente éste, podemos hablar de *funcionario de facto.*

Con respeto, el enfoque decisorio mayoritario pertenece al "[m]undo jurídico descr[it]o por Lewis Carrol, en 'Alicia en [el] país de las Maravillas' ... donde se desarrolla aquella extraordinaria competencia de crocquet: flamencos vivos como mazos, erizos vivos como bolas y sotas vivas como arcos; pero —país de las maravillas, donde todo era vida— *sin normas o con normas a las que no se prestaba atención, porque en el juego todo era 'vida' y se escapaba a su consideración".* (Énfasis suplido.) C.R. Sanz, *Sobre el Derecho y el proceso,* 1983-B Rev. Jur. Arg. La Ley 875, 884.

## V

Al igual que en el pasado, no cuestionamos el loable propósito que inspiró la Ley Núm. 19 de 30 de octubre de 1975 (4 L.P.R.A. sec. 62a *et seq.*) que autoriza que jueces *pensionados* presten sus servicios en la Judicatura. *Designación Juez Especial,* supra. Enfatizamos, sin embargo, que en su origen la propia ley prohibía ese desempeño después de los setenta (70) años. A espaldas de la Constitución, la Ley Núm. 125, *supra,* pretendió eliminar esa prohibición.

*A su amparo, ilustres miembros pensionados de la Judi-catura prestaron valiosísimos servicios. Se destaca promi-nentemente el Hon. Hiram Torres Rigual, a quien nos unen fuertes lazos de entrañable amistad y cuyas excelentes cre-denciales como jurista conocemos muy de cerca por haber compartido durante más de una década en este Foro el que-hacer judicial y en esa gestión haber recibido el beneficio de su inteligencia, mesura y calor humano. Su amor, compro-miso y entusiasmo con la causa de la justicia le sitúan y acreditan como único Juez Asociado que, después de su re-tiro voluntario y prematuro, prestó por años valiosos servi-cios en el entonces Tribunal Superior, incluso más allá de la edad de retiro compulsorio.*