RBR CONSTRUCTION, S.E., peticionario, *v.* AUTORIDAD DE CARRETERAS Y TRANSPORTACIÓN DE PUERTO RICO Y su JUNTA DE SUBASTA, recurrida.

*Número:* CC-1996-351       *Resuelto:* 22 de diciembre de 1999

842

*Gerardo A. Quirós López*, abogado del peticionario; *Luis A. Rivera Cabrera* y *Raúl Castellanos Malavé*, abogados de la recurrida.

La Juez Asociada Señora Naveira de Rodón emitió la opinión del Tribunal.

El 30 de noviembre de 1994, RBR Construction (en adelante RBR) compareció junto a otros cuatro licitadores a una subasta convocada por la Junta de la Autoridad de Carreteras y Transportación de Puerto Rico (en adelante la Junta) para la realización de un proyecto en el Expreso Román Baldorioty de Castro. En dicha subasta la Junta leyó en voz alta el precio total de las proposiciones de cada uno de los cinco postores. Sin embargo, *no se procedió a leer los precios unitarios de cada partida de las tres licitaciones más bajas, como era la costumbre.* Tras eliminarse la licitación menor por deficiencias insubsanables, RBR re-

sultó ser el *postor responsable* más bajo en esta primera subasta.(¹)

El 1ro de diciembre de 1994 la Junta notificó a RBR que su licitación había sido rechazada debido a que su seguro de fianza ("Bid Bond")(²) "no fue cumplimentado en su totalidad de acuerdo a [los Arts.] 102.07 y 102.11 de los General Provisions". En concreto, el incumplimiento se reducía a que el seguro de fianza no contenía la fecha de subasta. El seguro de fianza, sin embargo, *había sido válidamente emitido por la cantidad requerida e identificaba claramente la obra para la cual había sido prestado.* RBR protestó mediante carta el rechazo de su licitación.

Posteriormente, el 17 de enero de 1995, la Junta notificó a todos los licitadores que la subasta había sido anulada. Dicha comunicación *no expresaba las razones que motivaron la decisión de anular.* La notificación de la Junta dispone como sigue:

> La Junta de Subastas de la Autoridad de Carreteras desea informarles que la subasta de referencia fue ANULADA, el 17 de enero de 1995.
> Desde el día indicado comenzó a correr el término de diez (10) días, para solicitar reconsideración de consideración [sic] afectado adversamente por la decisión de la Agencia, según dispone la Sección 3.19 de la Ley de Procedimientos [sic] Administrativos [sic] Uniforme de Puerto Rico, Ley Núm. 170 del 12 de agosto de 1988, según enmendado. [sic].
> Gracias por su participación en nuestras subastas.

A pesar de la solicitud de RBR al efecto, la Junta se negó a proveerle los fundamentos para la decisión de

---

(¹) La propia Autoridad de Carreteras y Transportación (en adelante ACT) admite en su comparecencia ante nos que, una vez la licitación más baja fue eliminada por deficiencias *insubsanables*, RBR *Construction* (en adelante RBR) se convirtió en el postor más bajo. Sin embargo, alega que por "tener omisiones contrarias a la sección 102.14 del *Blue Book* es altamente dudoso que se le hubiese adjudicado la subasta, de ésta no haber sido anulada ...".

(²) Cabe señalar que esta fianza se limita a garantizar que el licitador que obtenga la buena pro comparecerá a la posterior firma del contrato de la obra subastada. De no comparecer, la ACT recibe el 5% del costo aproximado de la obra en concepto de daños.

anular. Sin embargo, la Administración Federal de Auto-
pistas (FHA, por sus siglas en inglés), agencia de la cual la
Junta tenía que solicitar el aval para poder anular la su-
basta, proveyó a RBR copia de una carta de la cual se des-
prende el motivo. En ésta la Junta cita no haber *leído en
voz alta los precios unitarios por partida de las tres licita-
ciones más bajas* como el fundamento para anular la
subasta.

El 26 de enero de 1995, RBR solicitó la reconsideración
de la decisión de anular ante la Junta. Ésta fue rechazada
de plano y RBR solicitó la revisión al Tribunal de Primera
Instancia.([3]) Impugnó tanto la decisión de anular como el
fundamento por el cual la Junta rechazó su licitación. Ade-
más, pidió que se le declarara "postor razonable más bajo".

Inicialmente, el foro de instancia desestimó el recurso
por falta de jurisdicción. Fundamentó su decisión en que la
reconsideración ante la Junta se había presentado
tardíamente. Oportunamente, RBR acudió ante el Tribu-
nal de Circuito de Apelaciones (en adelante Tribunal de
Circuito) quien revocó y devolvió al foro de instancia para
la continuación de los procedimientos. Tras reevaluar el
recurso de revisión, el tribunal de instancia lo denegó en
sus méritos.

La escueta sentencia no expresó el *ratio decidendi* del
mencionado foro. Sin embargo, en una nota al calce, el tri-
bunal adujo *como fundamento adicional* para desestimar
que el recurso se había tornado *académico* porque la Junta
ya había celebrado una nueva subasta en la cual se había
adjudicado el proyecto a otro licitador.([4]) Cabe señalar que

---

([3]) Simultáneamente se presentó idéntico recurso ante este Foro. Ello en aten-
ción a que la Ley de la Judicatura de Puerto Rico de 1994 ya había entrado en vigor
y RBR no sabía con certeza cuál era el foro competente. Al recurso se le asignó el
número de AA-95-5 y, posteriormente, se remitió al tribunal de instancia. Se conso-
lidó con el recurso allí presentado mediante resolución el 11 de agosto de 1995.

([4]) En la nota al calce se dispone lo siguiente:
"*Además*, el recurso se tornó académico al celebrarse una nueva subasta y ad-
judicársele la misma y otorgarle el contrato a otro licitador desde hace más de un año
atrás." (Énfasis suplido.)

RBR intentó detener la celebración de la referida segunda subasta mediante dos mociones en auxilio de jurisdicción, las cuales no fueron atendidas.

Inconforme con dicho resultado, RBR acudió nuevamente al Tribunal de Circuito. En esencia, cuestionó la determinación de academicidad del tribunal de instancia. Además, reprodujo los planteamientos de que su propuesta fue indebidamente rechazada y de que la Junta anuló ilegalmente la subasta por no expresar a los licitadores los fundamentos. Argumentó que de determinarse que la Junta actuó de forma ilegal al anular la primera subasta y al rechazar su licitación, la Autoridad de Carreteras y Transportación (en adelante ACT) debía compensarle la pérdida económica sufrida.

El Tribunal de Circuito denegó el recurso ante sí por académico. Fundamentó su conclusión en que la segunda subasta se había celebrado y los trabajos del proyecto estaban avanzados. La terminación del proyecto estaba pautada para el 7 de noviembre de 1996. Además, el foro apelativo adujo que RBR no tenía razón en plantear que la subasta fue indebidamente anulada, ya que el *Reglamento de Subasta le confería a la Junta la facultad de cancelar la adjudicación del contrato en cualquier momento antes de éste ser formalizado.*

Al no estar de acuerdo con el dictamen del foro apelativo, RBR acudió ante nos. En apretada síntesis, RBR sostiene que el Tribunal de Circuito erró al determinar que el recurso ante sí era académico y al convalidar la actuación de la Junta de anular la subasta. Además, cuestiona la legalidad de la notificación cursada a los licitadores y la razonabilidad del fundamento por el cual fue descalificada su licitación. Le asiste la razón. Por ello, revocamos.

En primer lugar, nos corresponde examinar el señalamiento referente a la academicidad y la procedencia de la reclamación en daños. En segundo lugar, discutiremos la legalidad de la anulación de la subasta y la adecuacidad de

la notificación a los licitadores. Finalmente, veremos la razonabilidad del fundamento por el cual la Junta rechazó la licitación de RBR.

## I

Un caso académico es uno en que se trata de obtener un fallo sobre una controversia disfrazada, que en realidad no existe, o una determinación de un derecho antes de que éste haya sido reclamado, o una sentencia sobre un asunto que al dictarse, por alguna razón, no podrá tener efectos prácticos. *Pueblo v. Ramos Santos*, 138 D.P.R. 810 (1995); *Pueblo en interés menor M.A.G.O.*, 138 D.P.R. 20 (1995). "Esta doctrina requiere que durante todas las etapas de un procedimiento adversativo, incluso la etapa de apelación o revisión, exista una controversia genuina entre las partes." *Pueblo v. Ramos Santos*, supra, pág. 824.

Los tribunales pueden perder su jurisdicción en un caso por academicidad cuando ocurren cambios durante el trámite judicial, ya sean fácticos o en el derecho aplicable, que hacen que una controversia pierda su actualidad, de modo que el remedio que pueda dictar el tribunal no pueda tener efecto real *alguno* en cuanto a esa controversia. *Fulana de Tal v. Demandado A*, 138 D.P.R. 610, 626 esc. 6 (1995).

Sin embargo, hemos reconocido varias excepciones a la doctrina de academicidad, a saber: (1) cuando se plantea una *cuestión recurrente* que, por su naturaleza, se hace muy difícil dilucidarla nuevamente en los tribunales; (2) cuando la situación de hechos ha sido cambiada por el demandado, pero no tiene visos de permanencia; (3) cuando las controversias aparentemente son académicas, pero que en realidad no lo son *por sus consecuencias colaterales*, y (4) cuando el tribunal ha certificado un pleito de clase y la controversia se tornó académica para un miembro de la clase, mas no para el representante de la misma.

Véanse: *P.P.D. v. Gobernador I*, 139 D.P.R. 643, 676 (1995); *Pueblo v. Ramos Santos*, supra, pág. 825.

█ El hecho de que la Junta haya celebrado una nueva subasta y adjudicado el proyecto a otro licitador, no convierte en académica la controversia de autos. Ni siquiera la torna académica el que se haya terminado la construcción del proyecto en cuestión. No sólo se trata de una controversia susceptible de repetición; se trata de una controversia que tiene importantes consecuencias colaterales para el interés público de proteger los fondos del pueblo de Puerto Rico. No nos encontramos frente a una controversia ficticia en la cual no se puede proveer remedio real alguno. La adjudicación del proyecto no es el único remedio al cual RBR podría tener derecho.

Resolver en los méritos la presente controversia ciertamente afectará a las partes interesadas. De determinarse que la subasta fue ilegalmente anulada y que el fundamento para rechazar la licitación de RBR fue insuficiente, procedería que la Junta compensara a RBR por los daños que sufrió como consecuencia de estos actos. Como vemos, RBR no quedaría huérfano de remedio. A pesar de que no puede adjudicársele un proyecto que ya fue subastado y construido, RBR podría recibir compensación en daños si la agencia abusó de su discreción.

█ Ciertamente, el licitador perdidoso en una subasta ilegalmente anulada o adjudicada está impedido de recuperar ganancias dejadas de percibir en ausencia de fraude u otras circunstancias extraordinarias. Las ganancias dejadas de percibir son obtenibles, generalmente, sólo como remedio al incumplimiento de un contrato perfeccionado. No obstante, hemos reconocido que tanto el rompimiento injustificado de negociaciones precontractuales como el abuso de derecho son hechos ilícitos que pueden resultar en responsabilidad extracontractual. Véase *Prods. Tommy Muñiz v. COPAN*, 113 D.P.R. 517 (1982). Entre los daños extracontractuales sufridos en casos como el de au-

tos, podrían encontrarse, por ejemplo, los costos en los que se incurrió en prepararse para la licitación arbitrariamente anulada y otros gastos relacionados, incluyendo los intereses desde que se incurre en éstos.

Avalar la postura de que la celebración de una segunda subasta torna las reclamaciones de autos en académicas, sentaría un peligroso precedente que abriría las puertas a la arbitrariedad, la corrupción y el despilfarro de fondos públicos. En la práctica, toda subasta de la ACT anulada ilegalmente quedaría inmune a la revisión judicial con la mera celebración de una segunda subasta. Esto podría equivaler a darle un cheque en blanco al funcionario de gobierno para que continúe celebrando subastas hasta que el postor de su predilección obtenga la buena pro.

En vista de que la controversia ante nos no es académica, nos corresponde considerar la legalidad de las actuaciones de la Junta al anular la subasta y rechazar la licitación de RBR.

## II

¿Puede una agencia administrativa anular una subasta fundándose en que no se leyeron en voz alta los precios unitarios por partida aunque ello no sea un requisito reglamentario? ¿Puede una agencia administrativa ejercer su discreción irrestrictamente sin incurrir en responsabilidad? Veamos.

■ La sana administración de un gobierno es

> ... una virtud de democracia, *y parte de una buena administración implica llevar a cabo sus funciones como comprador con eficiencia, honestidad y corrección* para proteger los intereses y dineros del pueblo al cual dicho gobierno representa. (Énfasis suplido.) *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, 126 D.P.R. 864, 871 (1990).

■ El objetivo fundamental de las subastas es, precisamente, proteger al erario consiguiendo la construcción

de obras públicas y la adquisición de servicios de calidad para el Gobierno al mejor precio posible. Para ello es necesario fomentar la competencia libre y transparente entre el mayor número de licitadores posible.

■ En *Mar-Mol Co., Inc. v. Adm. Servicios Gens.*, supra, pág. 871, reiteramos la doctrina expuesta por este Tribunal desde *Justiniano v. E.L.A.*, 100 D.P.R. 334 (1971), a los efectos de que:

> Los propósitos de la legislación que regula la realización de obras y la contratación de servicios para el Gobierno y los sistemas de subastas gubernamentales son precisamente ésos: *proteger los intereses y dineros del pueblo al promover la competencia para lograr los precios más bajos posibles*; evitar el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido al otorgarse los contratos, y minimizar los riesgos de incumplimiento. (Énfasis suplido.)

■ El elemento de la secretividad en la etapa anterior a la apertura de la licitación resulta indispensable para que el trámite de subasta sea de competencia efectiva y honesta. La anulación arbitraria de una subasta válidamente celebrada claramente derrota este objetivo. Una vez se han abierto las licitaciones, todos los postores conocen las cotizaciones de sus competidores. Esto permite que los más poderosos económicamente tengan la oportunidad de reducir sus propuestas en la segunda subasta, eliminando así a sus contendientes. La anulación indebida de una subasta puede crear competencia desleal en el proceso de licitación, lo que, a su vez, podría tener como consecuencia el desalentar a un número de participantes en subastas gubernamentales posteriores.[5] La merma en los licitadores tiende a encarecer el costo de los bienes o servicios objeto de dichas subastas.

---

[5] En el presente caso, por ejemplo, a la primera subasta comparecieron cinco (5) postores, mientras que a la segunda sólo dos (2). Cabe destacar, además, que en la segunda subasta se adjudicó el proyecto por $13,912,828.44. Ello costó a El Pueblo de Puerto Rico por lo menos la suma adicional de $468,111.56, pues la licitación de RBR fue de $13,444,717.

■ En Puerto Rico el legislador no ha creído necesario aprobar una ley especial que regule los procedimientos de subasta aplicable a todas las compras gubernamentales. Queda, pues, a la discreción de cada agencia aprobar un reglamento que establezca el procedimiento y las guías a seguir en sus propias subastas. Ello, siempre y cuando el estatuto habilitador le delegue la facultad.

■ La Ley de la Autoridad de Carreteras y Transportación de Puerto Rico, mediante el Art. 4-G (9 L.P.R.A. sec. 2004g(a)), incorpora la política pública anteriormente delineada al disponer los parámetros a tenor con los cuales deben reglamentarse las subastas de la ACT:

> (a) El Secretario de Transportación y Obras Públicas y el Director Ejecutivo establecerán administrativamente los procedimientos y guías que habrán de regir los procesos de las subastas negociadas, *a los fines de obtener el mayor número de licitadores, promover la competencia entre éstos y mantener la confidencialidad del proceso de negociación anterior a la adjudicación.* (Énfasis suplido.)

Los reglamentos que rigen el procedimiento de subasta para la ACT fueron adoptados en virtud del mandato de ley antes citado. Por lo tanto, deben ser interpretados de forma cónsona con los objetivos de política pública delineados por la Legislatura en el estatuto orgánico que delegó a la ACT el poder de reglamentar sus subastas.

La ACT aprobó dos reglamentos que resultan pertinentes para resolver la controversia ante nos. De un lado están las Disposiciones Generales de las Especificaciones Estándar para la Construcción de Carreteras y Puentes de 1989 (en adelante las Disposiciones Generales).[6] Éstas regulan el proceso de apertura de la subasta, enumeran los fundamentos que obligan a la Junta a rechazar licitaciones y establecen que la Junta podrá rechazar licitaciones de

---

[6] Éstas se encuentran en el idioma inglés y se conocen como "General Provisions of the Highway Authority Standard Specifications for Road and Bridge Construction of 1989".

forma discrecional cuando ello beneficie "los mejores intereses" de la ACT.

De otro lado, el Reglamento de Subasta Formal de la Autoridad de Carreteras, Reglamento Núm. 02-001 de 7 de febrero de 1989 (en adelante el Reglamento) establece las facultades y responsabilidades en torno a la adjudicación y anulación de subastas. Examinemos primero las disposiciones pertinentes a la anulación de subastas.

## A. *La Anulación*

■ El Reglamento establece la responsabilidad de la Junta de hacer una recomendación de anulación de subasta *fundamentada*[7] al Director. Sin embargo, será este último quien tomará la determinación final de anular o adjudicar.[8] Al Director, además, se le reserva el derecho de cancelar la adjudicación de una subasta en cualquier momento antes de formalizar el contrato sin que ello conlleve penalidad o responsabilidad alguna para la ACT. Véase Art. VIIIA5 del Reglamento.

Esta reserva de derecho del Director justifica, según la ACT y el foro apelativo, la anulación de la subasta en controversia. Además, el Tribunal de Circuito interpreta que las disposiciones antes citadas relevan a la ACT *de cualquier responsabilidad* por los daños que puedan sufrir los licitadores en casos de anulación. No les asiste la razón.

■ Si bien es cierto que estas disposiciones confieren al Director de la ACT discreción para anular una subasta en cualquier momento antes de la formalización del

---

[7] El Art. VIIIB1 del Reglamento de Subasta Formal de la Autoridad de Carreteras, Reglamento Núm. 02–001 de 7 de febrero de 1989, dispone:

"B. Anulación de subasta

"1. De la Junta recomendar que se anule una subasta bajo consideración, *deberá indicar la razón o razones para tal acción* y, además, recomendará al Director una de las siguientes alternativas: ...."

[8] El Art. VIIIA5 del Reglamento de Subasta Formal de la Autoridad de Carreteras, Reglamento Núm. 02–001 de 7 de febrero de 1989, dispone:

"5. La adjudicación o anulación de toda subasta será hecha por el Director."

contrato, ello no implica que el ejercicio de este derecho esté exento de responsabilidad. Los derechos no pueden ejercerse de forma irrazonable ni en el vacío. Toda anulación de subasta tendrá que fundamentarse y expresar cómo dicha actuación beneficia a los mejores intereses de la ACT.

Tanto el abuso de derecho como su ejercicio arbitrario podrán ser fuente de responsabilidad. En *Velilla v. Pueblo Supermarkets, Inc.*, 111 D.P.R. 585, 588 (1981), señalamos al respecto:

> Es ilegítimo el ejercicio de un derecho cuando el titular excede manifiestamente los límites impuestos por la buena fe o por el fin social o económico de ese derecho.

El fin social que persigue la reserva del derecho a rechazar las licitaciones o a cancelar la subasta una vez adjudicada es permitir a la autoridad un grado de discreción y flexibilidad que le permita proteger sus intereses adecuadamente. Esto es, la discreción debe utilizarse para la consecución de los objetivos expresados en el estatuto orgánico de la ACT, a saber: (1) obtener el mayor número de licitadores; (2) promover la competencia, y (3) mantener confidencial el proceso de licitación. Sólo en relación a estos fines, o en protección de algún otro interés apremiante de El Pueblo de Puerto Rico, puede ejercerse la discreción administrativa delegada para anular una subasta válidamente adjudicada. Lo contrario sería permitir el abuso y la arbitrariedad.

Como fundamento para la anulación de la subasta, la Junta cita la omisión de la lectura en voz alta de los precios unitarios de las tres proposiciones más bajas. Alega ante nos la ACT que dicha lectura es un "requisito reglamentario", no obstante, omite citar la disposición legal que apoya esta contención. Aunque nos percatamos de que las Disposiciones Generales exigen que la Junta abra y

lea en voz alta *las propuestas*,([9]) no encontramos regla alguna que obligue a la Junta a leer específicamente *los precios unitarios por partida de los tres licitadores más bajos.*

Tampoco encontramos que la omisión de esta lectura deba conllevar la anulación de la subasta. En ausencia de una explicación de cómo dicha omisión afecta los intereses de la ACT, el trato justo a los licitadores o la adecuada adjudicación de la subasta, encontramos que el fundamento citado por la Junta para anular resulta irrazonable y arbitrario. Abusó de su discreción la Junta al anular la subasta.

## B. *Notificación*

Ahora bien, en el presente caso hay un segundo elemento que brinda apoyo a la determinación de arbitrariedad. La Junta, al comunicar la anulación a los licitadores, ni siquiera les explicó los motivos para esta decisión. Peor aún, se rehusó a proveerlos posteriormente cuando RBR los solicitó. ¿Es válida legalmente esta notificación? Entendemos que no. ¿Está la agencia obligada a proveer explicaciones a los licitadores? Resolvemos que sí.

██ Según el Reglamento, una vez el Director ha tomado la decisión de anular una subasta, le corresponde al Presidente de la Junta notificar a los licitadores. Dicho deber se encuentra plasmado en el Art. VIIIA7 del Reglamento de la forma siguiente:

> 7. El Presidente de la Junta tendrá la responsabilidad de *notificar por escrito* a los licitadores participantes en la subasta la decisión tomada por el Director. (Énfasis suplido.)

Ciertamente la disposición antes citada no exige a la Junta que notifique a los licitadores *los fundamentos* que tuvo para recomendar la anulación. Interpretada literal-

---

([9]) Véase Sec. 102.13 de las Disposiciones Generales de las Especificaciones Estándar para la Construcción de Carreteras y Puentes de 1989 (en adelante Disposiciones Generales).

mente, pareciera que bastaría notificarles la determinación de anular. Tampoco le son de aplicación a las subastas los requisitos para procedimientos adjudicativos formales establecidos en el Capítulo III de la Ley de Procedimiento Administrativo Unforme del Estado Libre Asociado de Puerto Rico, 3 L.P.R.A. sec. 2101 *et seq.* (en adelante L.P.A.U.).

■ No obstante, *las subastas son procedimientos informales* "sui géneris" que gozan de ciertas características adjudicativas. Por lo tanto, le son de aplicación los principios generales establecidos en la Sec. 3.16 de la L.P.A.U. que, en particular, dispone:

> Si la agencia concluye o decide no iniciar un procedimiento adjudicativo en un caso particular, terminará el procedimiento y notificará por escrito por correo certificado con acuse de recibo a las partes su determinación, *los fundamentos para la misma* y el recurso de revisión disponible. (Énfasis suplido.) 3 L.P.R.A. sec. 2166.

Para que el derecho a obtener la revisión judicial de la decisión sea efectivo, es imprescindible exigir que la notificación de la decisión, además de informar la disponibilidad y el plazo para solicitar reconsideración o revisión, esté fundamentada aunque sea de forma sumaria. Por lo tanto, resolvemos que los principios generales establecidos en la sección antes citada son aplicables a los procedimientos de subasta, aunque éstos sean de naturaleza informal. ¿De qué otra forma podremos los tribunales revisar si la decisión de anular respondía "a los mejores intereses" de la ACT? ¿Cómo asegurarnos de que no fue irrazonable, arbitraria o caprichosa la decisión?

■ No sólo nos parece irrazonable y sospechoso el fundamento de la Junta para anular, sino que la notificación a los licitadores fue totalmente inadecuada. Avalar la legalidad de una notificación como la de autos es convertir el trámite de revisión administrativa en una gestión fútil;

en un recurso sin significado sustantivo. Si la parte afectada desconoce las razones que tuvo la Junta para anular, no tendrá fundamentos para cuestionar su proceder. Los fundamentos para anular, además de ser necesarios para preparar un adecuado recurso de reconsideración o revisión, son información pública que debió ser provista a RBR si no en la notificación de anulación, cuando menos una vez se le solicitó a la Junta formalmente.

## C. *Rechazo de la licitación de RBR*

Por último, examinamos el rechazo de la propuesta de RBR. Se adujo como fundamento que en la fianza de subasta se omitió la fecha de la subasta.

■■■ Las disposiciones reglamentarias de la ACT disponen tanto el rechazo mandatorio de propuestas como el discrecional. La Sec. 102.04 de las Disposiciones Generales enumera las instancias en que la Junta está obligada a rechazar una licitación. Entre las razones establecidas se encuentra el no incluir un seguro de fianza *aceptable*.[10] No encontramos en el reglamento que el omitir la fecha de subasta en el seguro de fianza constituya una deficiencia insubsanable o que dicha deficiencia invalide un seguro de fianza o lo haga inaceptable.

■■■ La omisión de la fecha de subasta en el documento de fianza en este caso particular, a nuestro juicio,

---

[10] En la carta dirigida a RBR, la Junta de la Autoridad de Carretertas y Transportación (en adelante Junta) citó el incumplimiento con las Secs. 102.07 y 102.11 de las Disposiciones Generales como fundamento para el rechazo de su oferta. Sin embargo, la carta de la Junta a la Administración Federal de Autopistas explica que el rechazo de la propuesta de RBR se debió a que se presentó un seguro de fianza incompleto en violación a la Sec. 102.14a(5) de las Disposiciones Generales.

Hemos estudiado cuidadosamente las tres secciones y sólo esta última resulta pertinente al rechazo de la licitación ante nos. Sobre el rechazo mandatorio de licitaciones, la sección dispone:

"*102.14 Rejection of Proposals and Disqualification of Bidders*—

"a. The Board of Awards will reject a proposal for any of the following irregularities:

.        .        .        .        .        .        .

"(5) If the proposal does not include an acceptable proposal guaranty."

constituye una deficiencia totalmente inocua e insustancial que difícilmente podría justificar el rechazo de una licitación que cumpla con el resto de los requisitos. Especialmente, en vista de que: (1) La fianza había sido válidamente emitida por una compañía aseguradora aprobada por el Comisionado de Seguros de Puerto Rico; (2) se describía con precisión la obra afianzada; (3) se emitió por la cantidad requerida; (4) la ACT había obviado esta omisión en ocasiones anteriores, y (5) la propia ACT admite en su carta a la Administración Federal de Autopistas (en adelante FHA) que se trata de una deficiencia subsanable.

Nuevamente, ante la ausencia de una explicación razonable sobre cómo el rechazo de la licitación de RBR por omitir la fecha de subasta en el seguro de fianza responde a los mejores intereses de la autoridad, nos vemos forzados a concluir que el rechazo fue arbitrario. Sobre todo cuando el seguro cumplía con todos los requisitos sustantivos. Cabe enfatizar que la propia Junta admitió en su carta a FHA que dicha omisión fue mínima y de carácter subsanable.

▬ Los tribunales tenemos el deber de asegurar que al efectuar sus gestiones de compra y contratación, las instrumentalidades públicas cumplen con la ley, con sus propios procedimientos y que tratan de forma justa a los licitadores. En fin, que los dineros del pueblo se gastan en beneficio del interés público. No debemos perder de perspectiva que el Gobierno es el comprador y contratante más grande del país. La adecuada fiscalización de la utilización de los dineros del erario resulta de vital importancia para mantener la confianza del ciudadano en el Gobierno y una democracia saludable.

▬ Si bien es cierto que debemos gran deferencia a las determinaciones de las agencias administrativas, cuando éstas no se encuentran sustentadas por evidencia sustancial en el récord o cuando son irrazonables, nada nos impide intervenir. Nos encontramos ante una determina-

ción arbitraria cuando es infundada o irrazonable. La ausencia total de fundamentos razonables, tanto para anular la subasta como para rechazar la propuesta de RBR, nos fuerza a concluir que nos encontramos ante unas decisiones arbitrarias, producto de un procedimiento plagado de irregularidades.

Por los fundamentos que preceden, se expide el auto de *certiorari* revocando, tanto la sentencia emitida por el Tribunal de Circuito de Apelaciones como la dictada por el Tribunal de Primera Instancia, y se devuelve el caso al foro de instancia para que continúen los procedimientos de forma compatible con lo aquí resuelto.

*Se dictará sentencia de conformidad.*

Los Jueces Asociados Señores Rebollo López y Fuster Berlingeri concurrieron con el resultado sin opinión escrita. El Juez Asociado Señor Corrada Del Río hace constar que disintió por entender que el dictamen del Tribunal de Circuito de Apelaciones es sustancialmente correcto.