Arbona Lago, Juez Ponente
*680 TEXTO COMPLETO DE LA SENTENCIA
Antecedentes
La Autoridad de Energía Eléctrica de Puerto Rico (AEE) publicó una invitación para la subasta número Q-023705, requiriendo el suministro de Combustible Destilado Núm. 2 con .05% de azufre para ser utilizado en la Central de Ciclo Combinado de„ San Juan. Hizo lo mismo para la subasta número Q-023987, interesando el abastecimiento de Combustible Residual Núm. 6 con .50% de Azufre para la Central Termoeléctrica de Costa Sur. (Ap. de Recurso de Revisión, págs. 46-62 y 67-84, respectivamente.)
El 9 de marzo de 2007 se llevó a cabo la apertura de ambas subastas. En cuanto a la subasta núm. Q-023705 presentaron ofertas CMA Builders Corp. (CMA); Vitol S.A., Inc.; Morgan Stanley Capitol Group; Lukoil Panamericas, LLC; Peerless Oil and Chemicals, Inc.; Total Petroleum Corp.; Caribbean Petroleum Corp.; y Passco, Inc.; únicos ocho licitadores. Respecto a la subasta núm. Q-023987, participaron los antes mencionados postores con excepción de Caribbean Petroleum Corp., pero se añadieron los licitadores Trafigura AG y Esso Standard Oil (PR), para un total de nueve licitadores.
Evaluadas las propuestas, el 18 de abril de 2007, la División de Compras de la AEE (División de Compras) notificó que la buena pro de ambas subastas había sido adjudicada a CMA. (Ap. de Recurso de Revisión, págs. 2-7.) Conforme a las condiciones y especificaciones establecidas en la invitación de ambas subastas, el licitador agraciado tendría 15 días plazo a partir de la notificación de la adjudicación de las subastas para completar la fase de firma de los contratos y presentar las respectivas fianzas de ejecución (Performance bond), so pena de cancelar la adjudicación de las subastas y ejecutar las fianzas de licitación. (Ap., Recurso de Revisión, págs. 59 y 82.) Dicho término vencería el 3 de mayo de 2007, puesto que la notificación de la adjudicación de las subastas se verificó el 18 de abril de igual año.
*681 Para el 30 de abril de 2007, la AEE no había recibido de CMA los documentos necesarios para proceder a la firma de los contratos. Por ello, ese mismo día, el Ing. William Rodney Clark Martínez, gerente de la AEE, envió un correo electrónico a los representantes de CMA en el que aludió a las diversas gestiones infructuosas hechas por AEE para lograr comunicación con la empresa, e insistió en la necesidad de que se produjeran los documentos solicitados dentro del término dispuesto en la invitación a subasta. CMA no respondió la referida comunicación.
Vencido el término de 15 días antes aludido para que CMA sometiera la información y los originales de las fianzas de ejecución, los días 3, 7, 9, 14, 16 y 21 de mayo de 2007, la AEE remitió correos electrónicos y cartas concediéndoles a CMA plazo adicional para la entrega de los documentos y las fianzas de ejecución, a fin de culminar el proceso de la firma de los contratos e iniciar con el suministro de combustible. (Ap., Oposición, págs. 2-8.) En dichas comunicaciones, la AEE puntualizó la importancia de “finalizar el proceso, de manera que podamos requerir la entrega de combustible y comenzar a recibir el mismo durante este mes (mayo) o en los primeros días del mes de junio. Nuestra oficina ya est[á] sintiendo la presión de ver c[ó]mo disminuyen nuestros inventarios sin una fuente confiable para reponer los mismos lo que podría ocasionar (sic) apagones generalizados en la Isla.” (Id., a la pág. 5.)
Las prórrogas otorgadas transcurrieron sin que CMA sometiera las fianzas de ejecución solicitadas. No fue sino hasta el 29 de mayo de 2007 que CMA presentó dos fianzas de ejecución, respecto a las subastas aquí referidas, expedidas a su nombre por “United Surety & Indemnity Company” (USIC). (Ap., Oposición, págs. 9-18.)
Seis días más tarde, el 4 de junio de 2007, el Sr. Duhamel Iglesias Cacho, Vicepresidente del Departamento de Finanzas de USIC, cursó cartas a la AEE para informar que las fianzas de ejecución aquí en controversia habían sido “anuladafs]ya que el cliente (CMA) no cumplió con la Regla 29, Artículo 1 (pago de prima).” (Ap., Oposición, págs. 19-20, énfasis suplido)
En vista de lo anterior, el 5 de junio de 2007, la AEE envió cartas a CMA mediante las cuales notificó la determinación de cancelar la adjudicación de las subastas, atendido que su compañía fiadora, USIC, había anulado las fianzas de ejecución. En las misivas, la AEE informó a CMA que procedería “según las disposiciones del Reglamento de Subastas para estos casos.” (Ap., Recurso de Revisión, págs. 10-11.) A la postre, la buena pro de las subastas fue adjudicada al segundo mejor postor, previo a que las ofertas presentadas por los licitadores vencieran el 7 de junio de 2007.
Inconforme, el 15 de junio de 2007, CMA presentó “Solicitud de Reconsideración de Cancelación de Adjudicación de Subasta” ante la Secretaría de Procedimientos Adjudicativos de la AEE. Argumentó, en síntesis, que la notificación de la cancelación fue contraria a derecho, que no se le brindaron las advertencias legales pertinentes y que la determinación se tomó en contravención a los postulados del debido proceso de ley que le asiste a CMA. (Ap., Recurso de Revisión, págs. 24-26.)
Luego de varios incidentes procesales, innecesarios aquí pormenorizar, el 27 de septiembre de 2007, la Secretaría de Procedimientos Adjudicativos emitió una Resolución en la que denegó la reconsideración solicitada.
Luego de un análisis de la norma y jurisprudencia aplicables, el foro recurrido concluyó que:
“entregar las fianzas era un requisito para la contratación y fue requerido en varias ocasiones por la Autoridad a la peticionaria (CMA). La autoridad le concedió tiempo suficiente a la peticionaria para su cumplimiento. Toda vez que la peticionaria no tenía las fianzas al día, según obra en el expediente por falta de pago de prima, la cancelación de adjudicación del Contrato por parte de la Autoridad como determinación *682 administrativa procedía. ” (Ap., Recurso de Revisión, pág. 22.)
No conforme, el 6 de octubre de 2007, CMA acudió ante este foro de apelación intermedia vía la Revisión Administrativa del epígrafe e imputa a la Secretaría de Procedimientos Adjudicativos de la AEE incidir de la siguiente forma:

“PRIMER ERROR: Erró la parte recurrida, al ratificar la cancelación de adjudicación de las subastas de epígrafe en forma arbitraria, caprichosa y violatoria del debido proceso de ley.

SEGUNDO ERROR: Erró la parte recurrida al ratificar y sostener un (sic) acción de cancelación de adjudicación de la subasta de epígrafe, que no advirtió ni respetó derechos estatuarios esenciales del recurrente como parte perjudicada. ”

El 22 de octubre de 2007 emitimos una Resolución en la que concedimos a la AEE 30 días plazo para exponer respecto a la causa de epígrafe. El 14 de noviembre de 2007, la AEE presentó “Oposición a Recurso de Revisión”, quedando sometida la causa. Con el beneficio de los escritos de ambas partes, procedemos a disponer.
Exposición y Análisis
La sana administración de las finanzas públicas requiere que el Gobierno realice con eficiencia, honestidad y corrección toda actividad para la adquisición de bienes y servicios, con el propósito de proteger los intereses y dineros del pueblo al que representa. Cordero v. Municipio de Guánica, 170 DPR _, 2007 JTS 29; Empresas Toledo v. Junta, 168 DPR _ (2006), 2006 JTS 147; A.E.E. v. Maxon Eng. Servs., Inc., 163 DPR _ (2004), 2004 JTS 199; RBR Const., S.E. v. A.C., 149 DPR 836, 848-849 (1999). Por ello, el propósito de la legislación que regula la realización de obras y la contratación para la compra de bienes y los servicios de calidad necesarios para el Gobierno por vía de los sistemas de subasta gubernamentales, es la de lograr los precios más bajos posibles, evitar el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido al otorgar los contratos y minimizar los riesgos de incumplimiento, a la vez que promueve la competencia de licitadores responsables. Cordero v. Municipio de Guánica, supra; RBR Const., S.E. v. A.C., supra; Mar-Mol, Co. v. Adm. Servicios Gens., 126 DPR 864, 871 (1990); Cancel v. Municipio de San Juan, 101 DPR 296, 300 (1973).
En tal función es necesario que las agencias cuenten con la discreción necesaria para analizar las diversas ofertas presentadas con el ánimo de arribar a la mejor oferta de calidad, que satisfaga la necesidad pública y al menor costo posible. Cobra aquí relevante importancia el planteamiento esbozado por nuestro más alto foro judicial, respecto a que “[l]a agencia, con su vasta experiencia y especialización, se encuentra, de ordinario, en mejor posición que nosotros para determinar el mejor lidiador tomando en consideración los factores esgrimidos tanto por la ley como su Reglamento de SubastasEmpresas Toledo v. Junta, supra.
En el caso de marras, recae sobre el Comité de Subastas la función de conducir y adjudicar correctamente todas las subastas de la AEE. En el descargo de tal facultad, el Comité de Subastas ha de regirse por la política pública antes expuesta, por la ley orgánica de la AEE, así como por el “Reglamento de Subastas” de la AEE de junio de 2003.
En lo aquí pertinente, dicho Reglamento dispone en su Capítulo II, Sección 9, Art. A, los criterios a considerar para la adjudicación de una subasta:

"SECCION 9: ADJUDICACION DE SUBASTAS

*683 Zlri. A; Normas Generales
1. La subasta se adjudica a favor del postor más bajo evaluado cuya oferta responda sustancialmente a las especificaciones, términos y condiciones establecidos en la Invitación a la Subasta en casos de adquisición de bienes y servicios. (...) (Enfasis nuestro.)
4. La desviación sustancial de una oferta con respecto a los términos de pago, entrega, remoción, garantías, responsabilidad civil (liability) y demás términos y condiciones que se establecen en la Invitación a la Subasta conllevará la declaración de dicha oferta como una no respondiente. (Énfasis suplido.)
6. La Autoridad se reserva el derecho a rechazar todas o cualesquiera de las cotizaciones recibidas, si ello se estima necesario o conveniente a los mejores intereses de la Autoridad. (...)”
(Ap., Oposición, págs. 28-29.)
Así mismo, el referido Reglamento establece que la “Invitación a Subasta” contendrá una serie de “Términos y Condiciones” con los que el licitador tiene que cumplir para que su oferta se considere como respondiente, entre los que se incluye la fianza de ejecución. Capítulo II, Sección 2, Art. C, inciso 1 (b) del Reglamento de Subastas, supra. (Ap., Oposición, pág. 26.)
Finalmente, precisa señalar que las determinaciones tomadas por las Juntas de Subastas merecen gran deferencia de parte de los tribunales apelativos. Polanco v. Cacique Motors, 165 DPR _ (2005), 2005 JTS 101. Ello es así, por razón de que tales procedimientos tienen a su favor una presunción de regularidad y corrección que ha de ser respetada. Murphy Bernabe v. Tribunal Superior de P.R., 103 DPR 692, 699 (1975). Además, porque se trata de funciones, apreciaciones e interpretaciones efectuadas dentro del ámbito de la especialización (“expertise”) y experiencias de tales entes administrativos. Rodríguez v. Guacoso Auto, 166 DPR _ (2005), 2005 JTS 187. Por ello, la revisión judicial se limita a determinar si la agencia actuó arbitraria, caprichosa, ilegalmente o en forma tan irracional que su actuación constituye un abuso de discreción. Asociación v. Junta Planificación, 171 DPR _ (2007), 2007 JTS 146; Maldonado v. Junta, 171 DPR _, 2007 JTS 92; López v. Administración, 168 DPR _, 2006 JTS 146; Camacho v. AAFET, 168 DPR _ (2006), 2006 JTS 97; Rebollo Vda. de Liceaga v. Yiyi Motors, 161 DPR _ (2004); 2004 JTS 4.
II
La cuestión planteada ante nos se circunscribe a determinar si la Secretaría de Procedimientos Adjudicativos abusó o no de su discreción al denegar la reconsideración solicitada por CMA y con ello ratificar la cancelación de la adjudicación de las subastas que le habían sido otorgadas a dicha empresa, ante su incumplimiento en proveer las fianzas de ejecución requeridas.
De una lectura de las Invitaciones a las Subastas números Q-023705 y Q-023987, aquí en controversia, surge palmariamente que los licitadores fueron instruidos respecto a lo siguiente:

“Instructions to Bidders

11. Award and Rejection

*684
e. After award is notified, three (3) copies of the Contract will be sent to the successful bidder to be signed and returned to PREP A, accompanied by the performance bond required, if any. After execution of the Contract by PREP A, Bidder will be furnished with one (1) copy of the same.

Should the Bidder to whom award is made fail or neglect to execute the contract and to furnish the performance bond within fifteen (15) calendar days from notification of award, the award may be annulled and the bid bondfurnished with the proposal, forfeited in favor of the Puerto Rico Electric Power Authority. Award may then be made to the next lowest evaluated Bidder or another invitation to bid may be issued for the supply offuel, as determined by PREP A. ” (Ap., Recurso de Revisión, págs. 52-53 y 74.) (Énfasis y subrayado nuestro.)
Asimismo, entre los “Términos y Condiciones” a cumplir por los licitadores se dispuso lo siguiente:

"CONDITIONS AND SPECIFICATIONS

ARTICLE VIII

Bid and Performance Bonds

B. Upon execution of a Contract, Bidder will furnish a performance bond payable to the order of PREP A issued by a qualified surety company, authorized to do business in Puerto Rico and acceptable to PREP A... [.]
PREP A will accept a letter of credit for the same amount in lieu of a performance bond, de Revisión, págs. 60 y 82.) (Énfasis suplido.) [7” (Ap., Recurso
Del expediente administrativo trasciende que el 18 de abril de 2007, CMA fue debidamente notificado que las subastas antes referidas le habían sido adjudicadas. En vista de ello, CMA contaba con 15 días calendario, es decir, hasta el 3 de mayo de 2007, para presentar las fianzas de ejecución en aras de perfeccionar los contratos y comenzar la compra de combustible. Habida cuenta tal incumplimiento, desde ese momento, la AEE contaba con discreción en el descargóle sus funciones para cancelar la adjudicación de las subastas, conforme las disposiciones reglamentarias y las condiciones establecidas en las Invitaciones a las Subastas anteriormente citadas y que eran de total conocimiento de la recurrente.
No obstante el claro incumplimiento de CMA, la AEE optó por comunicarse con los representantes de la empresa con el propósito de brindar nuevas oportunidades para que ésta sometiera los documentos y fianzas de ejecución solicitados. No empece los múltiples requerimientos realizados por la agencia los días 3, 7, 9, 14, 16 y 21 de mayo de 2007, no fue sino hasta el 29 de mayo de 2007 que CMA entregó las fianzas de ejecución necesarias para concluir el trámite y proceder con la firma de los contratos. Sin embargo, sólo seis días más tarde, el 4 de junio de 2007, USIC (compañía fiadora de CMA) certificó a la AEE que las aludidas fianzas de ejecución habían sido canceladas dado el incumplimiento de CMA en el pago de las primas. En vista de lo anterior, el Comité de Subastas, en el ejercicio de su discreción, procedió a cancelar la adjudicación de la subastas.
De la concatenación de eventos antes reseñados resulta evidente que las fianzas de ejecución presentadas tardíamente por CMA no estaban en vigor porque fueron retiradas antes de su aceptación, hecho que impedía que AEE prosiguiera con el otorgamiento de los contratos para iniciar el suministro de combustible. Por tanto, es de concluir que la Secretaría de Procedimientos Adjudicativos actuó correctamente al confirmar lá determinación de la AEE de cancelar la adjudicación de las subastas por no haberse presentado las fianzas de *685 ejecución requeridas.
Un análisis de la totalidad de las circunstancias aquí expuestas, sobretodo las habidas con posterioridad a la notificación de la adjudicación de la buena pro a favor de la recurrente, demuestra palmariamente que la AEE se vio enfrentada ante una compañía cuya inercia en el cumplimiento del trámite post-subasta desató un ambiente de incertidumbre que, sin lugar a dudas, amenazó la certeza del suministro de combustible de dos grandes generatrices de energía eléctrica para el país. La omisión de CMA en el cumplimiento con lo requerido puso en grave duda la capacidad fiscal de CMA para cumplir con el suministro de combustible licitado. Asimismo, el proceder de CMA puso a la AEE en riesgo de perder las restantes cotizaciones presentadas, pues, de no haber actuado en tiempo, dichas ofertas vencerían el 7 de junio de 2007, ante un mercado altamente variable.
Contra todo lo anterior, CMA se limita a argumentar que la actuación de la recurrida al cancelar la adjudicación de las subastas fue arbitraria, pues: (1) se fundamentó exclusivamente “en la comunicación escrita y no corroborada de un tercero privado (USIC)... ”, (Escrito de Revisión, pág. 3), sin brindarle la oportunidad de exponer al respecto; (2) que la falta de pago de las primas de la fianza no brinda facultad alguna a su compañía fiadora (USIC) para anular la fianza de ejecución; y (3) que el acto de adjudicación de la subasta crea un vínculo contractual entre el licitador agraciado y la agencia que no puede ser resuelto unilateralmente. No le asiste la razón.
Respecto al acápite (1) basta aquí señalar que en la discusión del presente error, CMA se limitó a argumentar y reiterar que la agencia descansó únicamente en la aludida carta “unilateral y no corroborada”, cursada por la compañía fiadora a la AEE el 4 de junio de 2007, para cancelar la adjudicación de las subastas. Sin embargo, CMA no aclaró respecto a tales oportunidades, y ni argumentó respecto a la validez de las fianzas de ejecución.
No fue sino hasta el final de la discusión del error que CMA apuntó de forma general y conclusoria “que la información y documentación del tercero (USIC) que condujo a la cancelación de la adjudicación fue oportuna y rápidamente subsanada, rectificada y aclarada en una comunicación escrita que posteriormente fue sometida a la Autoridad.” (Escrito de Revisión, pág. 11.) (Énfasis suplido.) Sin embargo, CMA no incluyó la “comunicación escrita” en la que descansa su planteamiento. Por el contrario, incluyó una comunicación emitida por su compañía fiadora el 12 de junio de 2007 en la que se reitera que las fianzas de ejecución no entrarían “en vigor hasta que CMA tío efectúe los pagos de prima correspondientes.” (Ap., Recurso de Revisión, pág. 63.)
Por lo tanto, realmente estamos ante un aspecto de un error levantado, pero no discutido adecuadamente, por lo que se entiende renunciado. La mera alegación de un error, que luego no se fundamenta o discute, no debe ser motivo para revisar, modificar o de alguna manera cambiar una decisión de un tribunal o foro administrativo. Romero v. E.L.A., 169 DPR _ (2006), 2006 JTS 170; Morán v. Martí, 165 DPR _ (2005), 2005 JTS 116; Quiñones López v. Manzano Pozas, 141 DPR 139, 165 (1996).
En el acápite (2), CMA plantea que aun en el supuesto que se hubiere incumplido con el pago de las primas, ello no autoriza a USIC a anular las fianzas de ejecución. No le asiste la razón. De una mera lectura de los documentos que se incluyen con las fianzas trasciende que la cubiertas de dichas fianzas daría inicio una vez se emite el pago de la prima y éste es recibido por la fiadora. Así, el documento “Endoso Obligatorio de Primas y Condiciones de Cubierta - Puerto Rico” establece, en lo aquí atinente, que:

“Por la presente se entiende y se conviene que de conformidad con las reglas aprobadas por el Comisionado de Seguros de Puerto Rico, la presente fianza queda enmendada según las condiciones y estipulaciones vertidas a continuación:

*686 1. Primas de fianzas pagadas en su totalidad por usted: Si las primas de esta fianza han de ser pagadas en su totalidad por usted, la cubierta de la fianza será concedida siempre y cuando se haya pagado la prima total a, y ésta se haya recibido por, nosotros o nuestro representante autorizado en o antes de la fecha de efectividad indicada en la fianza. De lo contrario, la fianza entrará en vigor en la fecha en que se haya pagado la prima total a, y se haya recibido por, nosotros o nuestro representante autorizado, y procederemos según indica la Sección 4 de este 'Endoso. ” (Ap., Oposición, pág. 18.) Véase, además, Ap., Oposición, pág. 13.) (Énfasis en el original.)
Finalmente, respecto al planteamiento esgrimido en el acápite (3), precisa señalar que un licitador a subasta pública no se convierte en suplidor de AEE con la mera adjudicación de la subasta a su favor, por meramente resultar ser el licitador que cumple con todos los requisitos por el precio más bajo. Es menester que la agencia luego acepte la oferta y le otorgue el contrato, para que el postor pueda considerarse parte de un contrato vinculante. Justiniano v. E.L.A., 100 DPR 334, 340 (1971). Ergo, en vista de que CMA no suplió las fianzas de ejecución idóneas y correspondientes en tiempo hábil, no se pudo proceder con el perfeccionamiento de los contratos, por lo que no existió vínculo contractual alguno con la AEE.
Nada de lo actuado por la AEE y por el foro administrativo recurrido, respecto a la cancelación de la adjudicación de las subastas, implica error revocable. Consideramos que tal ejercicio de discreción fue apropiado y legal, amparado en las disposiciones reglamentarias antes citadas. Tal determinación responde al conocimiento y expertise administrativo, al cual debemos conferir un alto grado de deferencia. Tal actuación tiene a su favor una presunción de regularidad y corrección que ha de ser respetada. No hallamos que ante la totalidad de la constancia en autos, CMA demostrare ante este foro de apelación intermedia que en tal decisión administrativa medió arbitrariedad, ilegalidad o irrazonabilidad, por lo que se nos está vedado intervenir livianamente con el razonamiento administrativo para sustituirlo por el nuestro. Por tanto, no se cometió el error señalado.
III
Finalmente, en su segundo señalamiento, CMA argumenta que la Secretaría de Procedimientos Adjudicativos incidió al ratificar la determinación de la AEE, pues sostiene que la notificación de dicha determinación carece de efectividad legal, ya que la misma no informó sobre el derecho a solicitar reconsideración y revisión judicial y el término para ello. No nos persuade.
Es preciso aquí señalar que el trámite aquí acaecido es uno de contratación post-subasta por lo que no es de aplicación lo dispuesto en la sección 3.14 de la Ley de Procedimiento Administrativo Uniforme (LPAU), Ley Núm. 170 de 12 de agosto de 1988, según enmendada, 3 LPRA sees. 2101 et. seq. Sin embargo, una lectura de la comunicación informando la cancelación de la adjudicación de las subastas revela que CMA fue advertido que la AEE procedería “según las disposiciones del Reglamento de Subastas para estos casos.” (Ap., Recurso de Revisión, págs. 10-11.)
El expediente administrativo ante nos demuestra que sin dificultad alguna CMA presentó ante el foro recurrido una moción de reconsideración en tiempo y ha comparecido en término hábil ante esta Curia. En vista de ello, es preciso concluir que como cuestión de récord y realidad, CMA advino en conocimiento de la determinación de la AEE y sin mediar ventaja o desventaja de ninguna índole tuvo a su haber los derechos para impugnar el resultado oportunamente. En forma alguna se han lacerado las garantías reconocidas a la recurrente. No se cometió el error apuntado.
Dictamen
Conforme a lo expuesto, confirmamos la Resolución emitida él 27 de septiembre de 2007, por la Secretaría de Procedimientos Adjudicativos de la AEE, aquí recurrida.
*687 Notifíquese la presente inmediatamente por teléfono o telefacsímil y correo ordinario, a todas las partes.
Lo acordó y manda el Tribunal y lo certifica la Secretaria.
Leda. María Elena Pérez Ortiz
Secretaria del Tribunal de Apelaciones
ESCOLIOS 2008 DTA10
1. El Reglamento de Subastas de la AEE de junio de 2003 define el concepto “Invitación a Subasta" como aquel “[d]ocumentó que se envía a los proveedores registrados en el que se les solicita cotizaciones sobre combustible, bienes y servicios bajo los términos y condiciones que se especifican...". (Ap., Oposición, pág. 25.) (Énfasis suplido.)
2. En dicha oportunidad, nuestro más alto foro puntualizó, en lo pertinente, que:

“Se ha resuelto que una agencia tiene el derecho de revocar la adjudicación de la subasta antes de que se formalice el contrato correspondiente, ya que la adjudicación no obliga a la agencia hasta que se formalice por escrito el contrato de ejecución de obra conteniendo todos los requisitos legales. ”