TEXTO COMPLETO DE LA SENTENCIA
I
La parte peticionaria de epígrafe, Ferrovial-Agromán, S.A. (“Ferrovial”), solicita la revisión de una resolución emitida por la Junta Apelativa de Subastas (“la Junta Apelativa”) de la Autoridad de los Puertos de Puerto Rico el 3 de febrero de 2005 (“la Autoridad”). Mediante la misma, dicho foro desestimó por falta de jurisdicción la impugnación de adjudicación de subastas presentada por Ferrovial.
II
Surge de autos que Ferrovial es una corporación organizada bajo las leyes de España y autorizada para hacer negocios en Puerto Rico desde octubre de 1999. Su actividad principal consiste en el estudio, concesión, construcción y explotación de toda clase de obras públicas y privadas, así como en la construcción y explotación de todo tipo de servicios públicos relacionados con la infraestructura del transporte.
La recurrida, Autoridad de los Puertos, es una Corporación Pública del Estado Libre Asociado de Puerto Rico, que tiene como uno de sus propósitos, desarrollar, mejorar, poseer, funcional' y administrar todas las facilidades de transporte y los servicios aéreos y marítimos en, para y desde el E.L.A. Véase, 23 L.P.R.A. see. 336 (Supl. 2004).
Se desprende del récord que el 3 de febrero de 2004, la Autoridad celebró la subasta número 46-34 para adjudicar la construcción del proyecto denominado “Mejoras Pista Sur (Pista 10-28)” del Aeropuerto Luis Muñoz Marín de Carolina, Puerto Rico. Los trabajos consistirían en la reconstrucción de la pista 10-28 del Aeropuerto, así como la reconstrucción del andén general del área sur de la pista. Estos serían financiados con fondos de la Administración Federal de Aviación, (“FAA” por sus siglas en inglés), mediante el programa federal de mejoras aeroportuarias (Airport Improvement Program). A dicha subasta compareció como único licitador, Ferrovial, la cual cotizó los trabajos en $72 millones de dólares. El 6 de marzo de 2004, dicha subasta fue cancelada, ya que la licitación presentada por Ferrovial sobrepasaba en un 15% el costo estimado de la Autoiidad para las referidas obras.
El 4 de agosto de 2004 se celebró una segunda subasta, Núm. 4-45, para el mismo proyecto. Ferrovial, *212 compareció nuevamente como único lidiador.
En esta ocasión, la Compañía cotizó $79,389,406.70 para la alterna “1” (construcción de las pistas en hormigón), y $86,681,010.70 para la alterna “2” (pistas en asfalto). Estas sumas sobrepasaban el costo estimado por la FAA y la APPR, que era de $55,700,948.90, por la alternativa de concreto y $51,807,766.09 para la alternativa de asfalto. En cuanto a la primera, ésta se excedía en un 42.5% del estimado de la APPR y en la segunda el exceso era de 25.4%.
Mediante caita de 12 de agosto de 2004, la APPR solicitó autorización a FAA para negociar directamente con contratistas cualificados para este tipo de proyecto. Se adujo que la pista 10-28 tenía serias deficiencias, las cuales podrían ocasionar accidentes y afectar el tráfico aéreo. El 18 de agosto de 2004, la FAA accedió a la solicitud de APPR mediante comunicación escrita del señor W. Dean Stringer, Gerente de la Agencia federal.
Cónsono con lo anterior, en reunión y acta de el 9 de noviembre 2004, la Junta de Subastas recomendó la cancelación de la subasta y que se proceda a negociar directamente con contratistas que tengan la capacidad tanto financiera como en experiencia ... en proyectos de esta magnitud. Así las cosas, el Sr. Miguel Soto Lacourt, Director Ejecutivo de la Autoridad, solicitó a la Junta de Directores de la Agencia que se le autorizara negociar el contrato del proyecto con alguna compañía interesada. La solicitud establecía que, “[hjabiéndose celebrado 2 subastas, a la Autoridad le urge la ejecución de las obras de construcción de la pista. La vida útil de la actual pista ya sobrepasó los 30 años y es de vital importancia que el contrato para este proyecto se formalice antes de que finalice el año”. Añadió que la FAA “le requiere” a la Autoridad “que formalice el contrato...en o antes del 31 de diciembre de 2004. La solicitud concluyó con lo siguiente:
Frente a la urgencia de seleccionar y suscribir el contrato para este proyecto y ante la necesidad inaplazable de reconstruir la principal pista del Aeropuerto ..., el Director Ejecutivo solicita que se exima a la agencia de la celebración de otra subasta y se declare como una situación de emergencia la reconstrucción de la pista 10-28.

Se señaló, además, en la solicitud que de no negociarse y suscribirse el contrato para el proyecto, la Autoridad corría el riesgo de perder la asignación de fondos. ”

Igualmente, el 12 de noviembre de 2004, el Ing. Ángel L. Pérez Ortiz, Jefe de Asuntos de Ingeniería y Construcción de la Autoridad, luego de analizar la subasta número 4.45, recomendó la cancelación de la misma, y dada la urgencia de la reparación de la principal pista del aeropuerto Luis Muñoz Marín, recomendó que se procediera a sobcitar propuestas directamente a contratistas que tuviesen capacidad, tanto financiera como en experiencia, para realizar un proyecto de tal magnitud. Señaló el Ing. Pérez que así se evitaría poner en peligro la aceptación de fondos federales, ya que la FAA estaba de acuerdo con ese proceder, según lo expresara el Sr. W. Dean Stringer, en comunicación del 18 de agosto de 2004, antes mencionada.
El 16 de noviembre de 2004, la Junta de Directores acogió la solicitud del Director Ejecutivo y autorizó a negociar el contrato con alguna compañía que presentara un precio razonable conforme al presupuesto de la Autoridad, por constituir una situación de emergencia. Con el inicio de las negociaciones directamente con los contratistas se buscaba examinar las distintas partidas que pudieran variarse mediante eliminaciones y/o variaciones de ciertas condiciones de la subasta, según había sido licitada originalmente.
Mientras esto ocurría, Ferrovial había demostrado interés en negociar con la Autoridad un precio para el proyecto. Surge que, en un correo electrónico con fecha de 4 de octubre de 2004, y enviado por el señor Manuel Costa, Gerente General de Ferrovial, al Ing. Carlos Alboreda, Consultor de la Autoridad, se notificó un precio revisado de $68,600,000 por la alterna “2”. Esta cuantía no fue aceptada, pues la autorización que se tenía de la FAA era hasta la suma de $67,006,053.90.
*213 Mediante una carta de 17 de noviembre de 2004, el Ing. Arboleda notificó al señor Costa que la subasta 4-45 sería declarada “null or no-contest” para dar lugar a negociaciones directas con contratistas. Le expresó que, aunque la Autoridad y Ferrovial habían celebrado varias reuniones y tenido conversaciones telefónicas sobre el proyecto, y aunque ya tenían un precio por parte de Ferrovial, $68,600,000, era necesario que cumplimentaran el documento de propuesta revisada y sometieran su cotización formalmente. El documento tendría que contener el desglose del precio ofrecido por partidas unitarias.
La compañía LAGAN International, (“LAGAN”), también fue notificada de que se estaban aceptando propuestas para el proyecto. Se señaló como fecha límite para la entrega de propuestas el 24 de noviembre de 2004.
En esa misma fecha, el señor Costa envió a la Autoridad una comunicación en la que indicaba que, tomando en cuenta que dicha Compañía había sido la única licitadora en las dos subastas celebradas, y considerando las negociaciones que se llevaban a cabo entre las partes, aceptaban realizar la obra por $67 millones, como había indicado la Autoridad en una reunión celebrada el 24 de septiembre de 2004.
El 8 de diciembre de 2004, la Autoridad, por voz del Director Ejecutivo Interino, Ing. Evan González, respondió a la comunicación del señor Costa. En la misma se le indicó que la FAA se había negado a costear el proyecto a un costo mayor de aproximadamente $55 millones y que dicha Agencia Federal podría quizá aceptar hasta un costo de $60 millones. La Autoridad apuntó que Ferrovial había indicado claramente que no cotizarían por debajo de $68.8 millones. Les recordó que era necesaria la aprobación de la FAA y aclaró que su oferta de $67 millones no se consideraba como una final. Añadió el Ing. González que, ante la cancelación de las subastas y la autorización para negociar directamente con contratistas, la Autoridad podía considerar cualquier otra oferta además de la de Ferrovial. Finalmente, se indicó que “I hope that this explanation makes clear that in no way PRPA (la Autoridad) is bound to award the contract to Ferrovial Agromdnfor $67M. ”
El 10 de diciembre de 2004, la Autoridad notificó a Ferrovial la cancelación de la subasta, ya que las cotizaciones excedían el presupuesto de la Agencia. El 17 de diciembre de 2004, los representantes legales de Ferrovial impugnaron, mediante carta a la Autoridad, las actuaciones de dicha Agencia e imputaron violación a las disposiciones legales sobre subastas.
Mientras esto ocurría, LAGAN presentó una oferta por la cantidad de $61,845,179.15, con la que concluyó el desglose de los pi'ecios unitarios, según requerido.
Mediante comunicación del 24 de diciembre de 2004, el Ing. Arboleda le recomendó al Ing. Ángel Pérez, Jefe de Ingenieros y Construcción de la Autoridad, aceptar la oferta de LAGAN. Igualmente, lo hizo el 27 de diciembre de 2004, el señor Soto Lacourt, ante la FAA.
El 29 de diciembre de 2004, Ferrovial comunicó a la Autoridad que, luego de una revisión de costos, podían ofrecer un ahorro de 9% sobre la cotización de $67 millones, previamente anunciada. Sin embargo, además de estar sin firmar, tampoco incluyó los nuevos precios unitarios en los que se reflejaran los alegados descuentos.
Luego de varios trámites, mediante carta de 12 de enero de 2005, el Ing. González le comunicó al señor Costa que ya la Agencia había seleccionado la compañía para el proyecto. Le expresó que su oferta nunca fue aceptada por la Autoridad por no cumplir con lo requerido por la Agencia de desglosar el precio por partidas unitarias y por haber sido recibida posterior a la fecha que tenía la Autoridad para comunicarle a la FAA la compañía seleccionada. El Ing. González indicó que el 27 de diciembre de 2004, la Autoridad había notificado a la FAA la compañía escogida, por lo que la comunicación de Ferrovial de 29 de diciembre resultó tardía y no responsiva a los requisitos de la Autoridad.
*214 El 12 de enero de 2005, la FAA autorizó la contratación de LAGAN. Al día siguiente, la Autoridad notifico al señor Costa de la selección de LAGAN. El 14 de enero de 2005, el señor Costa le comunicó, mediante carta, al Ing. González, una nueva oferta proponiendo un descuento adicional de $350,000. Esta oferta fue rechazada nuevamente por la Autoridad por las mismas circunstancias, esto es: presentación tardía y no presentar el precio por partidas unitarias.
El 18 de enero de 2005, Ferrovial solicitó a la Autoridad copia del expediente de la subasta. La Autoridad le facilitó el mismo luego del pago de los derechos correspondientes.
El 21 de enero de 2005, Ferrovial presentó reconsideración de la decisión de la Autoridad de contratar a LAGAN ante la Junta Apelativa de Subastas de la Agencia. Adujo Ferrovial, en esencia, que el procedimiento utilizado por la Autoridad fue inválido, que la situación de la pista 10-28 no representaba una situación de emergencia y que se les violó el debido proceso de ley, entre otras cosas, porque la Autoridad no cumplió con los requisitos de notificación de adjudicación de subastas, según establecidos por nuestro Tribunal Supremo. Sostuvo, además, Ferrovial, que la Autoridad se negó a mostrarles el expediente administrativo. Finalmente, Ferrovial solicitó que se anulara la adjudicación a LAGAN y en cambio se le adjudicara a Ferrovial.
Mediante resolución de 3 de febrero de 2005, la Junta Apelativa desestimó la reconsideración de Ferrovial por falta de jurisdicción. Expresó la Junta que la sección 900.10 sobre Apelación de Decisiones de la Junta, disponía, en el inciso “Z>”, un término de diez días a partir de la adjudicación de la subasta para presentar un escrito de reconsideración. Indicó que Ferrovial presentó el suyo tardíamente, porque la notificación de cancelación de la subasta tenía fecha de 10 de diciembre de 2004 y el escrito se presentó el 24 de enero de 2005.
Igualmente, la Junta sostuvo que el escrito de Ferrovial trata de unas negociaciones en mercado abierto, materia que no entra en la jurisdicción de la Junta. Por último, la Junta dijo que Ferrovial no había pagado la fianza correspondiente que exige el Reglamento de Subastas.
De esta decisión, Ferrovial acudió mediante revisión administrativa, ante este Tribunal, conjuntamente con una moción en auxilio de jurisdicción en la que solicitó la paralización de los procedimientos. Mediante resolución de II de febrero de 2005, concedimos un término a la Autoridad para expresar su posición. Oportunamente, la Autoridad presentó su escrito de oposición a la solicitud de Ferrovial. A ello le siguieron varios incidentes procesales.
En su recurso, Ferrovial planteó los siguientes errores:

“a. erró la Autoridad de los Puertos de Puerto Rico, a través de su junta de subastas, al adjudicar la subasta a LAGAN International, de forma contraria a los postulados legales que rigen los procedimientos de subasta.

b. erró la Autoridad de los Puertos de Puerto Rico, a través de su junta de subastas, al “adjudicar” el contrato de obras a LAGAN.

c. International sin seguir ningún proceso reglamentario, menoscabando así el debido proceso de ley de la peticionaria.

d. erró la Autoridad de los Puertos, al no brindar a Ferrovial-Agromán una notificación de acuerdo al debido procedimiento de ley y en su lugar proceder a desestimar el recurso de revisión alegando no tener jurisdicción.

e. erró la Autoridad de los Puertos de Puerto Rico al negarse a mostrar el expediente administrativo a 
*215
Ferrovial-Agromán, utilizando subterfugios para dilatar los procedimientos y privando a la peticionaria de una adecuada representación. ”

Por estar íntimamente relacionados, discutiremos los errores en conjunto.
III
Según se conoce, el propósito de requerir que la realización de obras y la contratación por el gobierno sea conducido mediante el trámite de subasta es proteger los intereses y dineros del pueblo. Ha explicado el Tribunal Supremo de Puerto Rico que dicho mecanismo sirve para promover la competencia y lograr los precios más bajos posibles, evita el favoritismo, la corrupción, el dispendio, la prevaricación, la extravagancia y el descuido al otorgarse los contratos, y minimiza los riesgos de incumplimiento. A.E.E. v. Maxon Engineering Serv. Inc., 163 D.P.R. _ (2004), 2004 J.T.S. 199, a las págs. 489-490; Mar-Mol Co., Inc. v. Adm. Servicios Gens., 126 D.P.R. 864, 871 (1990); Cancel v. Municipio de San Juan, 101 D.P.R. 296, 300 (1973); Justiniano v. E.L.A., 100 D.P.R. 334, 338 (1971).
Ahora bien, la mera invitación por parte del gobierno a licitar en una subasta pública no crea derecho o expectativa a que el contrato proyectado llegue a perfeccionarse. Véase, Prods. Tommy Muñiz v. COPAN, 113 D.P.R. 517, 525 (1982).
Los organismos gubernamentales no están obligados a contratar, si así no lo desean. Aun cuando se hubiera otorgado la buena pro de una subasta, el Estado goza de la facultad de dejar la misma sin efecto. C. Const. Corp. v. Mun. de Bayamón, 115 D.P.R. 559, 563 (1984); Cancel v. Municipio de San Juan, 101 D.P.R. a las págs. 300-301; Justiniano v. E.L.A., 100 D.P.R. a la pág. 340; sin embargo, debe razonablemente justificar su actuación. RBR Const., S.E. v. A.C., 149 D.P.R. 836, 853-856 (1999).
Los procesos de subasta llevadas a cabo por el gobierno central y sus agencias no están gobernados por la Ley de Procedimiento Administrativo Uniforme. 3 L.P.R.A. see. 2169. Dichos procesos son de naturaleza informal. 3 L.P.R.A. see. 2169; Rafael Rosario & Assoc. v. Depto. Familia, 157 D.P.R. _ (2002), 2002 J.T.S. 93, a la pág. 1,342.
La Ley Orgánica de la Autoridad de los Puertos, Ley Núm. 125 del 7 de mayo de 1942, según enmendada, 23 L.P.R.A. see. 331 y ss., establece que todas “las compras y contratos de suministros o servicios, excepto servicios personales, que se hagan por la Autoridad, incluyendo contratos para la construcción de obras de la misma, deberán hacerse mediante anuncio de subasta... ”. 23 L.P.R.A. see. 341 No obstante, “cuando la suma estimada para la compra no exceda de diez mil dólares ($10, 000) y cuando el valor de la obra de construcción no exceda de veinticinco mil dólares ($25,000), podrá efectuarse la misma sin anuncio de subasta. Para compras cuyo valor fluctúe entre mil dólares ($1,000) y diez mil dólares ($10,000) y cuando el valor de la obra de construcción no exceda de veinticinco mil dólares ($25,000), la Autoridad deberá solicitar cotizaciones de por lo menos tres (3) fuentes de suministros. ” Id.
La Ley también exime a la Autoridad de celebrar subastas:

“(1) cuando se requiera la inmediata entrega de materiales, efectos y equipo, ejecución de servicios u obras de construcción debido a una emergencia según definido este término en las sees. 331 et seq. de este titulo;

(2) cuando se necesiten piezas de repuestos, accesorios, equipo o servicios suplementarios para efectos o servicios previamente suministrados o contratados;

(3) cuando se requieren servicios o trabajos de profesionales o de expertos y la Autoridad estime que en 
*216
interés de una buena administración, tales servicios o trabajos deban contratarse sin mediar tales anuncios;

(4) cuando los precios no están sujetos a competencia porque no haya más que una sola fuente de suministro o porque estén regulados por la ley; o

(5) cuando la Autoridad haya celebrado dos (2) subastas idénticas en especificaciones, términos y condiciones dentro de un período de tiempo no mayor de seis (6) meses, a partir de la fecha de apertura de la primera, siempre que dichas subastas hayan resultado desiertas. En tales casos, la compra de materiales, efectos o equipo, o la obtención de tales servicios, podrán hacerse en mercado abierto en la forma corriente en las prácticas comerciales. Al comparar proposiciones y hacer adjudicaciones, se dará debida consideración a aquellos factores (además de si el postor ha cumplido con las especificaciones), tales como el precio más bajo; la habilidad del postor para realizar trabajos de construcción de la naturaleza envuelta en el contrato bajo consideración; la calidad y adaptabilidad relativas de los materiales, efectos, equipo o servicios; la responsabilidad económica del lidiador, y su pericia, experiencia, reputación de integridad comercial y habilidad para prestar servicios de reparación y conservación; y el tiempo de entrega o de ejecución que se ofrezca. La Autoridad podrá decretar reglamentos para la presentación de licitaciones. ”

23 L.P.R.A. see. 341 (énfasis nuestro)
La Ley define emergencia como:
“[Ajquella situación revestida de unas necesidades públicas inaplazables, inesperadas e imprevistas causadas por sucesos o circunstancias de desgracia o infortunio fuera del alcance humano, que requieran acción inmediata por estar en peligro la vida o la salud de una o más personas, por estar en peligro de dañarse o perderse la propiedad pública o por estar en peligro de suspenderse o afectarse adversamente el servicio público. Dicha situación deberá ser establecida mediante resolución aprobada por la Junta de Directores de la Autoridad, donde se indique y fundamente en qué consiste tal emergencia.” 23 L.P.R.A. see. 332i (Énfasis nuestro).
El Reglamento de Subastas, Núm. 900, de la Autoridad, según enmendado, añade a la definición anterior que “[tjambién se entenderá como emergencia aquella situación en donde sin mediar negligencia, olvido o dilación administrativa, pueda perderse la oportunidad para adquirir los suministros o servicios deseados afectándose adversamente el interés público y que así se señale por el Director Ejecutivo, o se le señale a dicho funcionario y éste lo apruebe”. Reglamento de Subastas, sec. 900.3e
Dicho Reglamento establece los procedimientos a observarse para la celebración de subastas, así como la manera de apelar las decisiones de la Junta de Subastas. La sec. 900.1A del Reglamento establece que las mociones de reconsideración se deberán presentar “dentro del término de diez (10) días naturales a partir de la adjudicación de la subasta...”. Igualmente, la see. 900.ID establece que la Junta Apelativa de Subastas no tendrá jurisdicción sobre cualquier Moción de Reconsideración que sea radicada fuera del término establecido.
Como se sabe, nuestra facultad de revisión en el campo administrativo es limitada. Según la doctrina establecida por el Tribunal Supremo de Puerto Rico, las decisiones de los organismos administrativos especializados han de recibir deferencia por los tribunales, presumiéndose su corrección. La revisión judicial de las mismas se circunscribe a determinar si la agencia, en el caso particular, actuó arbitraria, ilegalmente, o de manera tan irrazonable que su actuación constituyó un abuso de discreción. Rivera Concepción v. A.R.P.E., 152 D.P.R. _ (2000), 2000 J.T.S. 155, a la pág. 160; Mun. de San Juan v. J.C.A., 149 D.P.R. 263, 280 (1999); Franco v. Depto. de Educación, 148 D.P.R. 703, 709 (1999); Misión Ind. P.R. v. J.P., 146 D.P.R. 64, 134 (1998); Henríquez v. Consejo Educación Superior, 120 D.P.R. 194, 210 (1987); Murphy Bernabé v. Tribunal Superior, 103 D.P.R. 692, 699 (1975).
*217 Por el contrario, si las interpretaciones de la agencia especializada son razonables y consistentes con el propósito legislativo que inspiran los estatutos directivos, el tribunal debe abstenerse de intervenir con las mismas. Costa, Piovanetti v. Caguas Expressway, 149 D.P.R. 881, 889 (1999); Misión Ind. P.R. v. J.P., 146 D. P.R. a la pág. 133; Com. Seg. P.R. v. Antilles Ins. Co., 145 D.P.R. 226, 234 (1998); Rivera v. A & C Development Corp., 144 D.P.R. 450, 461 (1997).
La intervención judicial con las actuaciones administrativas, de este modo, ha de centrarse en tres aspectos principales: (1) si el remedio concedido fue apropiado, (2) si las determinaciones de hechos están razonablemente sostenidas por la prueba, y (3) si las conclusiones de derecho del organismo administrativo son correctas. 3 L.P.R.A. see. 2175; P.R.T.C. v. J. Reg. Tel. de P.R., 151 D.P.R. 269, 281 (2000); Mun. de San Juan v. J.C.A., 149 D.P.R. a las págs. 279-280; Misión Ind. P.R. v. J.P., 146 D.P.R. a la pág. 129; Rivera v. A & C Development Corp., 144 D.P.R. a las págs. 460-461.
La norma reiterada en cuanto a las determinaciones de hechos formuladas por una agencia administrativa es que los tribunales no deben intervenir con las mismas- si están sostenidas por evidencia sustancial que surja del expediente administrativo considerado en su totalidad. Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. 70, 75 (2000); Domínguez v. Caguas Expressway Motors, 148 D.P.R. 387, 397-398 (1999); T-JAC, Inc. v. Caguas Centrum Limited, 148 D.P.R. 70, 80-81 (1999); Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. 425, 437 (1997); Hilton Hotels International v. Junta de Salario Mínimo, 74 D.P.R. 670, 687 (1953).
La evidencia sustancial para sostener la actuación administrativa es aquélla que una mente razonable puede aceptar- como adecuada para sostener una conclusión. La intervención del Tribunal está limitada a evaluar si la decisión de la agencia es razonable y no si hizo una determinación correcta de los hechos ante su consideración. Si existe más de una interpretación razonable de los hechos, los tribunales sostendrán la decisión de la agencia y no sustituirán su criterio por el de ésta. Al revisar las determinaciones de hechos, la evidencia debe ser considerada en su totalidad. Asoc. Vec. H. San Jorge v. U. Med. Corp., 150 D.P.R. a las págs. 75-76; Assoc. Ins. Agencies, Inc. v. Com. Seg. P.R., 144 D.P.R. a la pág. 437; Hilton Hotels International, Inc. v. Junta de Salario Mínimo, 74 D.P.R. a la pág. 687.
IV
A pesar de lo extenso del trámite administrativo entre las partes desde el inicio del procedimiento de subastas hasta el presente, el caso de autos resulta sencillo y claro, a la luz del ordenamiento vigente. La Autoridad, conforme a su ley orgánica, convocó a dos subastas, las que fueron canceladas por ser la única licitación presentada mucho más alta del presupuesto que la FAA concedería a la Agencia. Ante la situación de emergencia señalada por varios funcionarios de la Autoridad, y la ratificación de dicha situación y la potestad para negociar directamente con contratistas dada por la FAA y por la Junta de Directores de la Agencia, la autoridad procedió a ello.
En lo que respecta a la situación de emergencia, resulta evidente que una pista deteriorada aumenta el riesgo de accidentes y pérdidas humanas y materiales. La calificación de emergencia de la pista 10-28 es un asunto dentro del conocimiento especializado de la Autoridad como agencia administrativa y a la que le concedemos deferencia. No encontramos razón en el récord para sustituir dicho criterio.
Ferrovial se queja, principalmente, de que la Autoridad violó los procedimientos de subasta, sobre todo en cuanto a la notificación de la adjudicación se refiere. No obstante, hay que entender que la Autoridad no venía obligada a seguir ese procedimiento, una vez tomó la decisión de cancelar la segunda subasta y al comenzar un proceso de negociación directa con otros contratistas. No se trata en este caso de un procedimiento ordinario de subasta. Tampoco el contrato se otorgó a LAGAN mediante subasta, sino a través de negociación directa. Es por ello que la Autoridad se podía alejar de las disposiciones reglamentarias sobre adjudicación de subastas.
*218 Igualmente, surge de autos que Ferrovial tuvo la oportunidad de presentar sus ofertas según las solicitó la Autoridad, mediante desglose de partidas unitarias, mas no lo hizo. La Autoridad notificó, en más de una ocasión, a Ferrovial de este requisito. Lo anterior, sumado a la dilación en presentar la oferta, así como la dilación en presentar la oferta, llevaron a la Autoridad a no poder considerar la misma.
Consecuentemente, la Junta Apelativa declaró sin jurisdicción, debido, entre otras cosas, a que el procedimiento impugnado por Ferrovial no se trataba de una subasta, sino de una negociación directa. Al así proceder, la Junta Apelativa actuó correctamente por la naturaleza de la transacción recurrida. Ello, sin embargo, no impide que este Tribunal asuma jurisdicción como un recurso de Revisión Administrativa ordinario y disponga del mismo en sus méritos, como por la presente hacemos. No se cometieron los errores señalados.
Por los fundamentos expresados, se confirma el dictamen de la Junta de Subastas.
Así lo acordó y manda el Tribunal y lo certifica la Secretaria General.
Laura M. Vélez Vélez
Secretaria del Tribunal de Apelaciones